462 A.2d 211

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Leslie GAMBIT, Sharmel Howard, and Geneva Massey, Appellees.**

Supreme Court of Pennsylvania.

Submitted Dec. 9, 1982.

Decided July 8, 1983.

Robert F. Banks, First Asst. Dist. Atty., Kenneth D. Brown, Dist. Atty., for appellant.

John M. Humphrey, Williamsport, for appellees.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## ORDER

PER CURIAM.

Order affirmed.

LARSEN, J., dissents in the result without an opinion.

McDERMOTT, J., files a dissenting opinion.

McDERMOTT, Justice, dissenting.

On the afternoon of July 28, 1978, the shopkeepers of Williamsport, PA, were marked for pillage by a band of shoplifters. From the goods found in their car, the thieves were expert and efficient. They were caught flat out and now their catching is the issue before us. I regret that the majority is satisfied to issue a per curiam order affirming the Superior Court, 274 Pa.Super. 571, 418 A.2d 554, without defining their reasons in an area of law, dangling in the winds of change. Changes, one hopes, that will relieve us of the woeful need to discharge defendants so obviously guilty, that they defile our ostensible search for truth. The facts of this case are neither strange nor startling. Indeed, they comport with the solid expectation of thieves, that they may steal at will, because neither the obvious or the certain counts against an "unreasonable" search.

I adopt the facts as distilled by the Superior Court.

At about 2:15 p.m. on July 28, 1978, Mary Dauberman, radio dispatcher for the Williamsport Police Department, received a phone call from an employee of Jones Specialty Shop, a clothing store located in the business district of Williamsport.[1] The caller stated that another employee had just noticed that an expensive suede coat was missing and that she suspected that the coat had been taken by three black women in the store minutes before. She suspected the black women because only a few other customers, all well known to the sales personnel, had been in the store. She gave a detailed description of the three women. Lt. John Reiff was standing by Dauberman when she received the call and heard the conversation. Immediately, he and Corporal George Stack left to investi-

---

1. The parties have stipulated to most of the facts. Where they dispute the facts, we have accepted those facts which, with reasonable basis in the record, support the findings of the suppression court. *See Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976).

gate the incident. As Reiff departed, he heard the phone ring again but did not hear the ensuing conversation.

Dauberman broadcast a radio report based on the call from Jones' Specialty Shop. The second phone call was from another clothing shop located near Jones'. The second caller reported that he had seen three black women, identical in appearance to those in Jones', trying on clothes in his store. Soon after they left, he realized some articles were missing. Dauberman broadcast this message also.

Minutes after leaving the station, Reiff and Stack spotted Gambit and Howard standing by a white car parked in the business district about a half block from the police station. As the officers approached, Reiff saw one of the women place her hand on the door of the car, turn, look in his direction and then begin to walk off slowly in the other direction with the second woman. Reiff called to the women, who walked back towards him. Reiff asked the women to come with him to the station, and the women complied. When he looked in the car's window, Reiff observed a filled black plastic bag in the back seat. Reiff ordered Stack to guard the car while he escorted the women to the station. The doors to the car were locked and a car was parked at each end of the vehicle, blocking its exit. Reiff arrived at the station with the two women at about 2:30.

After watching the car for five minutes, Stack left his post to drive another officer's car to the station. During his absence, some employees of the victimized stores guarded the car. As he returned to the white car, Stack saw another officer, Mnick, standing with the third woman, Massey. He took Massey to the station, after which he returned to the car to guard it. Except for the five minutes when he was away, Stack had the car under constant surveillance until it was searched.

At the station, the police searched all three women, discovering items taken from several stores. All the items had their sales tags, indicating that appellants had not

paid for them. None of the women had keys to the car which, the police learned by tracing the license plate, was registered in the name of someone in Pittsburgh. Sometime after 4 p.m., appellants were arraigned.

At about the same time, Reiff began to consider a search of the white car. He sought advice from Kenneth Brown, an assistant district attorney on duty at the station. Brown concluded that grounds existed for a search of the car. Reiff and Brown walked down the hall to the magistrate's office where, they believed, the arraignment was in progress. When they arrived, they learned that the arraignment was over and that the magistrate, the only one on duty, had left to perform a wedding. Reiff believed it would take at least two hours to type an affidavit in support of a search warrant and to present it to another magistrate, who would have to be called at home and requested to come to the station. Reiff said that he did not know whether Stack would be available to guard the car until a magistrate would authorize a search and that a vehicle driven by a black man, who might be a confederate, had been seen circling the block. Brown recommended that grounds existed for a warrantless search. Sometime after 5 p.m., the police searched the car, removing the plastic bag, which contained the suede coat missing from Jones'. They found other stolen goods in the trunk.

The suppression court suppressed the evidence obtained from the search of the car on the ground that the police had performed a warrantless search of a stopped automobile without the necessary exigent circumstances. The court upheld the search at the station on the ground that probable cause existed for the arrest of each appellant.[2]

The Superior Court reversed the trial court holding the arrest in the station house was illegal and suppressed the evidence found on appellants as poisoned fruit.

2. Although the suppression court determined that Reiff merely detained the two women to whom he called and did not arrest them until their arrival at the station, the Commonwealth concedes that Reiff arrested the two women at the car.

I would find that the police officers properly stopped appellees on the street and that, given the totality of the circumstances, the accompanying of appellees with their consent, *one-half block* to the police station at City Hall did not constitute an arrest. When the officers accompanied by the appellants arrived at the police station and learned of the subsequent calls, probable cause existed and the arrest then occurred. The search of appellees was then proper and the stolen goods then found were admissible.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the United States Supreme Court pointed out that "a police Officer may in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry* further states that a stop for investigatory purposes is justified if the "police Officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ... " *Terry supra,* 392, U.S. 1 at 30, 88 S.Ct. 1868 at 1884. *See also, Commonwealth v. Greber,* 478 Pa. 63, 385 A.2d 1313 (1978). In the instant case the police officer had at his disposal, a detailed description of the suspects, the general area in which to search for the suspects and his 28 years of experience. When he approached the vehicle parked approximately one block from the store reporting the theft, the two women immediately reversed their directions and began to walk away. Officer Reiff testified that the women fit the given description to a "tee", which coupled with the abrupt reversal by the women alerted him to the fact that these women were acting suspiciously.

The ensuing request to walk to the police station, only one-half block away, was the result of the officer's concern for the suspects. The suppression court reasoned that had the officers remained at the scene with the presumably innocent women, a midafternoon crowd could have been expected to accumulate as the investigation continued. Moreover, Officer Reiff testified that he did not want to

frisk a woman in public. (N.T.S.H. at 21.) His main concern thus revolved around his being male and the suspects being female. Such an event would be embarrassing, even traumatic to two innocent pedestrians. Under the given circumstances it was an entirely reasonable request to change the locus for the *Terry* stop.

On the issue of whether evidence taken from the third appellee, Massey, while at the police station should be suppressed, I would find that Massey was arrested with probable cause at the time she was intercepted by Officer Mnick on the street just after appellees Gambit and Howard were stopped. The record shows that Officer Mnick apprehended Massey at the direction of Officer Wilson who had knowledge of the radio dispatches. Accordingly, the fact that the initial telephone complaint, in and of itself, may not be sufficient probable cause to arrest appellees Gambit and Howard, clearly, knowledge of three calls from three different storeowners detailing the same description of the three appellees was sufficient probable cause to arrest appellee Massey.

In addition, I would find that the necessary facts exist in this case to permit the warrantless search of the automobile under the exigent circumstances exception to the rule prohibiting warrantless searches and seizures. The police testified that a vehicle driven by a black man, who might be a confederate of appellees, was seen circling the block. As Officer Reiff noted, "It was my concern from the start that the car would have been moved, and if there's anything of evidence type in that car, it could have been disposed of ...." (N.T.S.H. at 19.) Moreover, Reiff also testified that the police force was undermanned on that day (N.T.S.H. at 19). In addition, the police were restrained from towing and impounding the vehicle because parked cars hemmed it in on both ends. And, the absence of a magistrate had thwarted the police effort to secure a warrant. It is obvious that when all the facts are observed we find the police doing all within their power to avert the loss of possible evidence. For the nonce, all time wasted.

I dissent from the majority's decision today for the same reasons that I dissented in *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982)—"That a block and a half might swallow the *'Terry* exception' is the type of finicky preciousness that has solidified our reputation for unreality."

Perhaps historians of a future, hopefully recovered from our preciosities and all their consequences, will teach sounder lessons. Teach that freedom from oppressive governments is only one aspect of liberty, that mature societies learn there are other enemies of comfort and societal life. Enemies, who belong to no political cabals and have no aspirations beyond stealing from their neighbors, who when plainly caught by those acting in good faith and duly tried in open and public trial, shall not be freed because a Tarquin may try to come again.