610 A.2d 1020

COMMONWEALTH of Pennsylvania

v.

Luis Miguel SANCHEZ, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 5, 1991.

Filed June 3, 1992.

164

William T. Cannon, Philadelphia, for appellant.

Karen L. Grigsby, Asst. Dist. Atty., Philadelphia, for Com. appellee.

Before ROWLEY, President Judge, and WIEAND and JOHNSON, JJ.

WIEAND, Judge:

Luis Miguel Sanchez was tried by jury and was found guilty of second degree murder, rape, robbery and burglary in connection with the rape and strangulation death of an eighteen year old woman in Philadelphia on September 21, 1989. He was sentenced to prison for life.[1] On direct appeal from the judgment of sentence, he argues in the alternative that judgment should be arrested because of insufficient evidence or a new trial granted because of trial errors. Of the alleged trial errors the most significant is appellant's contention that it was prejudicial error to allow the jury to hear evidence of a post-arrest, suicidal ideation.

---

1. The trial court held that the convictions for rape, robbery and burglary merged for sentencing purposes in the conviction for murder of the second degree.

When police were summoned to 1804 North Seventh Street, Philadelphia, on September 21, 1989, they found the body of Rosario Sosa lying on the third floor staircase with the cord from an iron drawn tightly around her neck. The medical examiner pronounced her dead at the scene and determined the cause of death to be homicide by ligature strangulation. Vaginal and rectal swabs were positive for the presence of spermatozoa, and vaginal bleeding and tearing suggested forcible rape.

Eighteen year old Rosario had remained home alone when other members of her family had gone to church. Family members leaving for church and neighbors had observed appellant seated a few doors down from the Sosa home. Appellant, therefore, was deemed a suspect. When it was learned that there was an outstanding warrant for his arrest, police were instructed to take him into custody. Several hours later, appellant was observed by police a block from the scene of the crime. When he was asked to approach the police car, however, appellant fled. After a short chase, in which additional officers participated, appellant was taken into custody. At the homicide unit, appellant waived his rights under *Miranda*[2] and gave a statement. He admitted that he had been present in the Sosa house, from which he had stolen a VCR, but he denied raping or killing Rosario. Rather, he said, he had tied her to the railing to prevent her from running away, and she had fallen and hung herself while trying to escape. Evidence was also introduced to show that bloodstains on the shirt worn by appellant, which he had attempted to discard while being chased by police, were of the same type as the blood of the victim. Moreover, appellant's blood type placed him within that group of people who were capable of producing the seminal fluid found in the victim's vagina. There was also evidence that two bedrooms in the Sosa house had been ransacked and that a VCR, two watches and $700 in cash had been taken.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 Appellant argues that in the absence of an illegally obtained, inculpatory statement, there was insufficient evidence to support the jury's several findings of guilt. In advancing such an argument appellant misperceives the applicable law. A "request for a limited review of the evidence to determine its sufficiency to sustain the jury's verdict is inappropriate." *Commonwealth v. DiSabatino*, 399 Pa.Super. 1, 4, 581 A.2d 645, 646 (1990). " 'It is well settled ... that in determining the sufficiency of the evidence to support the verdict, we are required to consider all evidence actually received, whether the trial court's rulings on evidence were correct or incorrect.' " *Id.*, quoting *Commonwealth v. Pankraz*, 382 Pa.Super. 116, 119–120, 554 A.2d 974, 976 (1989). See also: *Commonwealth v. Smith*, 523 Pa. 577, 582, 568 A.2d 600, 602–603 (1989); *Commonwealth v. Manhart*, 349 Pa.Super. 552, 556, 503 A.2d 986, 988 (1986). The proper test is whether, viewing all the evidence admitted at trial, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner, the jury could have found that each and every element of the charged offenses was proved beyond a reasonable doubt. See: *Commonwealth v. Smith, supra* 523 Pa. at 581, 568 A.2d at 602; *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990); *Commonwealth v. Jackson*, 506 Pa. 469, 472–473, 485 A.2d 1102, 1103 (1984). When all the evidence is so viewed, including appellant's inculpatory statement to police, it is abundantly clear that sufficient evidence was produced by the Commonwealth to support appellant's several convictions.

 Appellant's inculpatory statement, moreover, was properly received and was entitled to full jury consideration. In reviewing a trial court's ruling on a motion to suppress evidence,

'we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the

prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.'

*Commonwealth v. Whitney*, 511 Pa. 232, 239–240, 512 A.2d 1152, 1156 (1986), quoting *Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). See also: *Commonwealth v. O'Shea*, 523 Pa. 384, 395, 567 A.2d 1023, 1028 (1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990); *Commonwealth v. Hughes*, 521 Pa. 423, 438–439, 555 A.2d 1264, 1271–1272 (1989). Contrary to appellant's argument, the police had ample probable cause to take him into custody prior to his interrogation. The evidence produced at a pre-trial suppression hearing was reviewed by the trial court as follows:

Police [O]fficer Joseph Sisca testified that the defendant and the victim's family had difficulties which predated this brutal attack. These difficulties included boasts by the defendant that he had raped two of the sisters previously. The officer also testified that the defendant told the victim's sister to keep Rosario (the victim) in the house today and not to let her out. The defendant made this statement prior to watching the family leave the house for church without the victim.

Police Officer Pedro Vargos testified that he received information concerning a possible perpetrator at the scene also and passed this information on to the detectives assigned.

Police Officer Luis Lazarde testified that at roll call he was told to be on the lookout for a "Hispanic male wearing black baseball cap, white sweatshirt, working boots, possibly wanted for a homicide, 1804 North 7th Street." This information was provided by Sergeant Richard Fehrle.

Detective Raymond Dougherty, the assigned homicide detective[,] collected all of the information at the scene concerning the suspect. This information along with a description was given to the officers at [the] scene and they were directed to pass this information along to the officers reporting for duty at midnight. Detective Dougherty also telephoned his information into homicide headquarters and at approximately 11:30 p.m. received notice that the defendant was also the subject of an outstanding bench warrant for failure to appear at a court proceeding.

. . . .

Police [O]fficer Lazarde while on patrol received flash information over the radio that the defendant was being pursued by Sergeant Fehrle. Officer Lazarde took up the chase which was approximately one block from the crime scene and within several hours of discovering the victim's body. As he pursued the defendant, Officer Lazarde noticed that the defendant removed the baseball cap and sweatshirt he was wearing and discarded them. These items fit the clothing description which had been broadcast concerning the defendant.

Officer Lazarde caught up with the defendant and after a brief struggle during which the officer was knocked to the ground and injured, the defendant was taken into custody. The defendant was transported to the homicide unit of the Police Administration Building, where, after waiving his Miranda rights, he gave a statement.

"To be constitutionally valid, a warrantless arrest must be supported by probable cause." *Commonwealth v. Anderson*, 360 Pa.Super. 466, 470, 520 A.2d 1184, 1186 (1987). See also: *Commonwealth v. Lewis*, 394 Pa.Super. 403, 408, 576 A.2d 63, 66 (1990); *Commonwealth v. Merriwether*, 382 Pa.Super. 411, 419, 555 A.2d 906, 910 (1989).

In this Commonwealth, the standard for evaluating whether probable cause exists is the "totality of the circumstances" test set forth in *Illinois v. Gates*, 462 U.S.

213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Commonwealth v. Baker,* 513 Pa. 23, 518 A.2d 802 (1986), *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985). The bench mark of a warrantless arrest is the existence of probable cause, namely, whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. *Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026 (1979).

*Commonwealth v. Rodriguez,* 526 Pa. 268, 272–273, 585 A.2d 988, 990 (1991). See also: *Commonwealth v. Fromal,* 392 Pa.Super. 100, 112–113, 572 A.2d 711, 717 (1990); *Commonwealth v. Butler,* 354 Pa.Super. 533, 537–538, 512 A.2d 667, 669–670 (1986).

'When we examine a particular situation to determine if probable cause exists, we consider all the factors and their total effect, and do not concentrate on each individual element ... We also focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might ... Finally, we must remember that in dealing with questions of probable cause, we are not dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent men act. This is not the same 'beyond-a-reasonable-doubt' standard which we apply in determining guilt or innocence at trial. *Commonwealth v. Devlin,* 221 Pa.Super. 175, 289 A.2d 237 (1972).'

*Commonwealth v. Simmons,* 295 Pa.Super. 72, 83, 440 A.2d 1228, 1234 (1982), quoting *Commonwealth v. Kazior,* 269 Pa.Super. 518, 524, 410 A.2d 822, 824–825 (1979). See also: *Commonwealth v. Chase,* 394 Pa.Super. 168, 171–172, 575 A.2d 574, 575–576 (1990); *Commonwealth v. Ellis,* 354 Pa.Super. 11, 17–18, 510 A.2d 1253, 1256 (1986) (en banc).

In making an arrest, a police officer may also rely on information which he or she has received via police radio.

See: *Commonwealth v. Groff,* 356 Pa.Super. 477, 489, 514 A.2d 1382, 1388 (1986); *Commonwealth v. Prengle,* 293 Pa.Super. 64, 68, 437 A.2d 992, 994 (1981). In this regard, the Superior Court has said:

> 'An arresting officer, in executing a valid arrest, may rely upon radio broadcasts emanating from police facilities provided, however, that the arresting officer has been either (1) ordered or directed to perform the arrest by an officer in possession of facts justifying the arrest; (2) received information justifying arrest; or (3) heard information which, coupled with facts he personally observed, provided probable cause to arrest. *Commonwealth v. Gambit,* 274 Pa.Super. 571, 577–578, 418 A.2d 554, 557 (1980), *aff'd.,* 501 Pa. 453, 462 A.2d 211 (1983). *Accord Commonwealth v. Prengle,* 293 Pa.Super. 64, 67, 437 A.2d 992, 994 (1981).'

*Commonwealth v. Reddix,* 355 Pa.Super. 514, 519, 513 A.2d 1041, 1043 (1986), quoting *Commonwealth v. Evans,* 343 Pa.Super. 118, 128, 494 A.2d 383, 388 (1985). See also: *Commonwealth v. Fromal, supra* 392 Pa.Super. at 112, 572 A.2d at 717.

Instantly, ample probable cause existed for appellant's arrest for the killing of Rosario Sosa. Not only did police have knowledge that the victim's family had had problems with appellant, but appellant had been observed outside the victim's house when the rest of the family went to church. He also had told the victim's sister earlier that day that she should not let the victim out of the house. Finally, police knew that there was an outstanding bench warrant for appellant's arrest. Under these circumstances, it is abundantly clear that appellant's arrest was proper and that his motion to suppress his statement to police was correctly denied.

During cross-examination at trial, appellant was asked whether he had voluntarily signed himself into the psychiatric unit upon his arrival at prison. Appellant conceded that he had been in the psychiatric unit for about a month but denied that he had voluntarily signed himself

into the unit and said that he had been admitted for tests. He also denied that he had told anyone that he wanted to kill himself or that he had been thinking of killing himself. The Commonwealth, in rebuttal, called the record custodians for the prison's health care system and its mental health care services program. Barbara Powell, the records supervisor for Correctional Health Care Solutions, testified that appellant, upon arrival at the prison, had been given a medical intake exam by a physician's assistant who recorded that appellant had said that he felt suicidal. As a result, appellant had been referred for a psychiatric consultation, and a petition had been filed to place appellant in the psychiatric unit. James Sheffer, the records custodian for Hahnemann University Correctional Mental Health Services, testified that the patient discharge summary contained a statement of reasons for appellant's admission into the prison psychiatric unit reciting that "because of the nature of his charges he is thinking about killing himself in the near future." The psychiatric records further reflected that appellant had signed a voluntary commitment form under Section 201 of the Mental Health Procedures Act, and that, upon his admission into the psychiatric unit, suicide precautions had been taken involving close monitoring by medical personnel. On redirect examination, the following notation by a staff psychiatrist was also read into the record:

At the time of admission he was sad, motor activity was decreased. Speech was slow and soft and he was withdrawn. Flow of thought was slow. Mood revealed anxiety and depression. There were suicidal thoughts and he felt guilty and worthless. He denied auditory hallucinations. Sensorium, intelligen[ce] and insight were intact.

Prior to charging the jury, the trial court determined that it would not refer to the evidence of appellant's suicide ideation during its instructions to the jury. The court said:

The only case that I have on suicide is where the person involved has attempted to commit suicide. I have no case as—my law clerk has not found any, no, which deals with

having an ideation of suicide. I will charge on flight, which deals with, of course, his running, his throwing away articles that may have been used for identification. And I will make the appropriate charge on that. That is the only thing that I know of in the flight charge.

During closing argument, however, the prosecuting attorney made the following remarks:

One of the things that the Court, I'm sure, will instruct you on is flight. And where there is flight you may infer a consciousness of guilt from the defendant's actions in the fleeing. And [ ] trying to throw away any evidence such as the sweatshirt, that that is evidence of consciousness of guilt. *I submit to you that [ ] his words to the doctors, when he got up to the prison, of feeling guilty and worthless, and the possible suicide thoughts, were also evidence of his feelings of guilt at that point. And that all ties together.* (emphasis added).

Appellant argues that a mere suicidal ideation is both irrelevant and prejudicial.

 In general, "[e]vidence that the accused attempted to commit suicide is relevant as a circumstance tending in some degree to show consciousness of guilt." 1 Wharton's Criminal Evidence, § 159, at p. 649 (14th ed. 1985). It is admissible on the theory that "[a]n *attempt at suicide* may be construed as an attempt to flee and escape forever from the temporal consequences of one's misdeed." 2 Wigmore, Evidence § 276(f), at p. 131 (Chadbourn rev. 1979). As a general rule, therefore,

[t]he fact that one charged with a crime attempts to commit suicide soon after the offense occurs, or in order to escape prosecution for committing such crime, is admissible in evidence. The principle upon which evidence of flight of one accused of a crime is admitted is applicable to evidence that the accused, when in custody, charged with crime, attempted to take his own life and thereby escape further prosecution. Attempted suicide, as does flight, tends to show a consciousness of guilt.

29 Am.Jur.2d, Evidence, § 284 (footnotes omitted). See also: Annot., Admissibility of Evidence Relating To Accused's Attempt to Commit Suicide, 22 A.L.R.3d 840 (1968).

■ In *Commonwealth v. Giacobbe*, 341 Pa. 187, 193, 19 A.2d 71, 74 (1941), the Pennsylvania Supreme Court held that a jury had properly been allowed to consider two suicide attempts by the defendant following police interrogation because such attempts tended to establish consciousness of guilt. This evidence was admissible, the Supreme Court observed, "on the same theory as flight, or manifestations of mental distress, fear, nervousness or excitement on the part of one charged with crime." *Id.* In *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A.2d 743 (1953), the Supreme Court further stated:

> Flight, manifestations of mental distress, fear at the time of or just before or just after discovery of the crime, an attempt to commit suicide at such time, as well as evidence to prove motive, intent, plan or design are admissible. Cf. *Commonwealth v. Giacobbe*, 341 Pa. 187, 19 A.2d 71; *Commonwealth v. Boschino*, 176 Pa. 103, 34 A. 964; *Commonwealth v. Del Giorno*, 303 Pa. 509, 154 A. 786; *Hester v. Commonwealth*, 85 Pa. 139; *McManus v. Commonwealth*, 91 Pa. 57; *McMeen v. Commonwealth*, 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Minoff*, 363 Pa. 287, 69 A.2d 145, and other cases cited in *Commonwealth v. Peay*, 369 Pa. 72, 81, 90, 85 A.2d 425; *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301; *Commonwealth v. Guida*, 298 Pa. 370, 148 A. 501.

*Id.* 373 Pa. at 159, 94 A.2d at 747. Under this rule announced by the Supreme Court, not only an attempted suicide by a defendant is admissible to show consciousness of guilt, but also a defendant's conduct evidencing fear or mental distress.

Instantly, appellant does not attempt to distinguish evidence of suicide ideation from evidence of an actual attempt to commit suicide. He argues, rather, that the mere mention of suicide is so prejudicial as to deprive a defendant of a fair trial. He relies upon language used by the Superior

Court in *Seals, Inc. v. Tioga County Grange Mutual Insurance Co.*, 359 Pa.Super. 606, 519 A.2d 951 (1986), *appeal dismissed*, 518 Pa. 75, 541 A.2d 314 (1988), wherein the Court said:

> To commit suicide is in the minds of many a reprehensible, even immoral and sinful act. At minimum, it is the violent act of a severely troubled person. To this jury, evidence of such violence and mental instability, or even immorality, might have been enough to support in the jurors' minds an inference of arson. Since they may have decided on this clearly improper basis, a new trial without the suicide evidence is required.

*Id.* 359 Pa.Super. at 616, 519 A.2d at 956 (citations omitted). *Seals*, however, was a civil action to recover the proceeds of a fire insurance policy. The defendant insurance company defended on grounds that the insured had intentionally set the fire. The only evidence offered to support the claim of arson was the fact that the insured had murdered his girlfriend and then committed suicide just ten days after the fire. The Superior Court held that the evidence of the insured's suicide was irrelevant because there was no evidence to suggest that the insured's suicide had been related to the fire. The Superior Court reasoned:

> The evidence of Plank's suicide is only relevant to the arson defense if in fact Plank killed himself because he had set the fire. Our examination of the record in this case leads us to conclude that Tioga failed to lay an adequate foundation by way of expert or other testimony as to the reasons for Plank's suicide. Tioga submitted evidence that Plank was "nervous" when discussing the fire. It also showed that Plank had discussed the fire with some investigators who were investigating the fire and that they had asked Plank about his whereabouts the night of the fire and told him they thought the fire might have been arson. This alone does not at all demonstrate that Plank took his life because he feared prosecution for arson.

. . . .

We find unpersuasive Tioga's citation to criminal cases in which evidence of attempted suicide by an accused has been admitted to show guilty conscience and, therefore, guilt. *See Commonwealth v. Giacobbe,* 341 Pa. 187, 19 A.2d 71 (1941); *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A.2d 743 (1953). In both *Giacobbe* and *Homeyer,* the connection between the guilt of the defendant and the attempted suicide was clear.

*Id.* 359 Pa.Super. at 614–615, 519 A.2d at 955.

In the instant case, there was ample evidence from which a jury could infer a connection between appellant's thoughts of suicide and the crimes with which he had been charged. Here, the thoughts of suicide were expressed after appellant had been arrested, interrogated and confined on charges of murder and rape. His suicide ideation was first conveyed to the physician's assistant who was conducting a medical intake evaluation. Later, upon being moved to the prison psychiatric unit, it was noted on appellant's chart that he had been admitted because he was thinking of killing himself as a result of the nature of the charges against him. Thus, although there could have been other reasons to explain appellant's suicidal thoughts, there was support for an inference that he was thinking of killing himself because he was conscious of guilt. Under these circumstances, we do not find *Seals* to be controlling.

Our research has disclosed decisions from other jurisdictions which have permitted a defendant's attempted suicide to be considered by the jury as a circumstance evidencing consciousness of guilt. See, e.g.: *People v. Barrett,* 22 Cal.App. 780, 136 P. 520 (1913); *McKinney v. State,* 466 A.2d 356 (Del.1983); *State v. Hargraves,* 62 Idaho 8, 107 P.2d 854 (1940); *People v. Duncan,* 261 Ill. 339, 103 N.E. 1043 (1913); *State v. Mitchell,* 450 N.W.2d 828 (Iowa 1990); *Commonwealth v. Goldenberg,* 315 Mass. 26, 51 N.E.2d 762 (1943); *State v. Campbell,* 146 Mont. 251, 405 P.2d 978, 22 A.L.R.3d 824 (1965); *State v. Painter,* 329 Mo. 314, 44 S.W.2d 79 (1931); *State v. Exum,* 213 N.C. 16, 195 S.E. 7

(1938); *State v. Plunkett,* 62 Nev. 258, 149 P.2d 101 (1944); *State v. Brown,* 128 N.H. 606, 517 A.2d 831 (1986); *State v. Mann,* 244 N.J.Super. 484, 582 A.2d 1048 (1990); *State v. Blancett,* 24 N.M. 433, 174 P. 207 (1918), *appeal dismissed,* 252 U.S. 574, 40 S.Ct. 395, 64 L.Ed. 723 (1920); *State v. White,* 649 S.W.2d 598 (Tenn.Cr.App.1982). However, we have found only one decision which addresses mere threats by a defendant to commit suicide. In *People v. O'Neil,* 18 Ill.2d 461, 165 N.E.2d 319 (1960), it was observed that "the threat of suicide, as does flight, tends to show a consciousness of guilt." *Id.* at 465, 165 N.E.2d at 321. In *O'Neil,* the Supreme Court of Illinois reasoned that the defendant's post-arrest threat to kill himself was an additional circumstance corroborating his confession and, thus, aided in establishing the corpus delicti for arson.

 After careful consideration, there appears to us to be no sound basis for excluding evidence of a defendant's post-arrest, suicide ideation. Evidence of actual attempts to commit suicide are uniformly admitted as evidence tending to show consciousness of guilt on the part of the defendant, and a similar inference can be drawn from a threat to commit suicide. In reaching this conclusion, we are guided by our Supreme Court's pronouncement that not only attempts to commit suicide, but also manifestations of mental distress tend to demonstrate a defendant's consciousness of guilt.[3] See: *Commonwealth v. Homeyer, supra; Commonwealth v. Giacobbe, supra.* Certainly, by expressing a desire to kill himself, a defendant manifests emotional distress as an aftermath of being arrested and subjected to pre-trial incarceration. We hold, therefore, that a jury can reasonably infer consciousness of guilt from the fact that an accused has made one or more threats to commit suicide or has expressed suicidal thoughts.

**3.** Whether it is probable that one who has been arrested and charged with a criminal offense will more likely manifest mental distress if he is guilty than if he is innocent is a policy decision which may be worthy of future Supreme Court consideration.

 The Commonwealth's evidence that appellant had been suicidal following arrest and confinement was contained in prison medical and psychiatric records. Appellant, although conceding the admissibility of business records, argues that reports of his suicide ideation were excludable as a second level of hearsay.

In *Hreha v. Benscoter*, 381 Pa.Super. 556, 554 A.2d 525 (1989), the Superior Court said:

A business record, of course, is recognized as an exception to the hearsay exclusion. See: 42 Pa.C.S. § 6108; *In re Indyk's Estate*, 488 Pa. 567, 413 A.2d 371 (1979); *Fauceglia v. Harry*, 409 Pa. 155, 185 A.2d 598 (1962); Packel and Poulin, Pennsylvania Evidence, Ch. VIII, § 803.6 (1987). Where a business record contains multiple levels of hearsay, however, it is admissible only if each level falls within a recognized exception to the hearsay rule. See: *Felice v. Long Island Railroad Co.*, 426 F.2d 192, 197 (2nd Cir.1970), *cert. denied*, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Cf. *Commonwealth v. Scott*, 503 Pa. 624, 630, 470 A.2d 91, 94 (1983) ("When dissecting a double hearsay statement, the reliability and trustworthiness of each declarant must be independently established.").

*Id.* 381 Pa.Super. at 565, 554 A.2d at 529.

Here, however, appellant's statements regarding suicide were clearly admissible. They were admissible as admissions. In *Commonwealth v. Tervalon*, 463 Pa. 581, 345 A.2d 671 (1975), the Supreme Court said:

As a general rule voluntary, extrajudicial statements made by a defendant may be used against that defendant although they contain no admission of guilt. *Commonwealth v. Wentzel*, 360 Pa. 137, 150, 61 A.2d 309 (1948); *Commonwealth v. Tenbroeck*, 265 Pa. 251, 254, 108 A. 635 (1919). See generally, McCormick, Law of Evidence, § 144 (2d ed. E. Cleary 1972). These extrajudicial statements, which differ from confessions in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for introduction into evidence

under the admission exception to the hearsay rule. McCormick, *supra*, § 262; 4 Wigmore, Evidence § 1048 (Chadbourn rev. 1972).

*Id.* 463 Pa. at 590, 345 A.2d at 676 (footnote omitted). See also: *Commonwealth v. Smith*, 518 Pa. 15, 39, 540 A.2d 246, 257 (1988); *Commonwealth v. Hoyman*, 385 Pa.Super. 439, 449–450, 561 A.2d 756, 761–762 (1989).

His statements were also admissible because they were statements made to a doctor for diagnosis and treatment and referred to symptoms, feelings and conditions. See: *Cody v. S.K.F. Industries, Inc.*, 447 Pa. 558, 291 A.2d 772 (1972). See also: *Commonwealth v. Sanford*, 397 Pa.Super. 581, 594–596, 580 A.2d 784, 791–792 (1990); *Hreha v. Benscoter*, *supra* 381 Pa.Super. at 565–566, 554 A.2d at 529–530.

Appellant also contends that statements which he made in the prison psychiatric unit were protected from disclosure by the statutory psychiatrist-patient privilege found at 42 Pa.C.S. § 5944 and by the confidentiality provisions of the Mental Health Procedures Act.[4] However, appellant did not assert these bases for excluding the

**4.** Section 111 of the Mental Health Procedures Act provides as follows:

**§ 7111. Confidentiality of records**

All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;

(2) the county administrator, pursuant to section 110;

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. This shall not restrict the collection and analysis of clinical or statistical data by the department, the county administrator or the facility so long as the use and dissemination of such data does not identify individual patients. Nothing herein shall be construed to conflict with section 8 of the act of April 14, 1972 (P.L. 221, No. 63), known as the "Pennsylvania Drug and Alcohol Abuse Control Act." Act of July 9, 1976, P.L. 817, No. 143, § 111, 50 P.S. § 7111.

evidence during trial and did not assert them in his post-trial motions.[5] Therefore, neither the psychiatrist-patient privilege nor the confidentiality provisions of the Mental Health Procedures Act have been preserved as issues for appellate review. "[T]he failure to raise an issue, objection, or argument in a timely manner during trial forecloses further review of an alleged error in post-trial motions or at the appellate level." *Commonwealth v. Johnson*, 368 Pa.Super. 427, 435, 534 A.2d 511, 515 (1987). " 'It is fundamental that the parties in a trial are obligated to inform the court of alleged violations of evidence law or trial procedure, and that the failure to so inform the court by a timely and specific objection, motion, exception, request, or offer of proof will constitute a waiver of that ground for relief.' " *Commonwealth v. Schneider*, 386 Pa.Super. 202, 214, 562

---

**5.** The physician-patient privilege which has been incorporated into the Pennsylvania Judicial Code at 42 Pa.C.S. § 5929 and the psychiatrist-patient privilege which was established by the legislature in 1989 at 42 Pa.C.S. § 5944, are entirely different privileges. At trial, appellant did not assert the statutory privilege between psychiatrist and patient. He also did not preserve that issue in his post-trial motions, where he asserted only the following:

5. The learned trial judge erred in allowing the Commonwealth to introduce testimony in the form of readings by a record custodian to the effect that within days of the crime the Defendant was suicidal and that he had reported to his physicians an extremely heavy drug use habit. These statements, when recorded, were made by the accused to his treating physicians. The business records exception to the hearsay rule does not permit the introduction of such statements at trial. To the extent that prior case law established the notion that the doctor-patient privilege applies only to civil cases and not to criminal cases, that case doctrine is fallacious and should be overturned. The Commonwealth should never be permitted to use the oral confidences that an incarcerated accused intimates to his treating physician in a treatment setting as substantive evidence against him.

Appellant has not argued the physician-patient privilege on appeal; however, we note that this privilege has been held to be inapplicable to criminal cases. See: *Commonwealth v. Sykes*, 353 Pa. 392, 398–399, 45 A.2d 43, 46 (1946), *cert. denied*, 328 U.S. 847, 66 S.Ct. 1021, 90 L.Ed. 1620 (1946); *Commonwealth v. Edwards*, 318 Pa. 1, 6–7, 178 A. 20, 22–23 (1935); *Commonwealth v. Moyer*, 407 Pa.Super. 336, 342, 595 A.2d 1177, 1180 (1991); *Commonwealth v. Petrino*, 332 Pa.Super. 13, 32–33, 480 A.2d 1160, 1170 (1984), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1984).

A.2d 868, 874 (1989), quoting Packel & Poulin, Pennsylvania Evidence, Ch. I, § 103, at p. 5 (1987).

■ As part of the defense strategy, appellant attempted to focus the finger of suspicion on the victim's stepfather. In this regard, the defense emphasized that there was no evidence of a forcible entry at the victim's house, suggesting thereby that the perpetrator had used a key to gain entry. Evidence was also produced that an older sister of the victim had on one occasion complained to the police that she had been sexually abused by the stepfather. Although several Commonwealth witnesses testified that the stepfather had been attending church services at the time when the victim was raped and murdered, the Commonwealth did not call the stepfather as a witness to deny assertions made by the defense. Therefore, the defense sought to have the jury instructed that it could draw an adverse inference from the Commonwealth's failure to call the stepfather as a witness. The trial court refused the requested instruction.

■ In *Commonwealth v. Moore*, 453 Pa. 302, 309 A.2d 569 (1973), the Supreme Court stated:

Generally, when a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not be merely cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference it would have been unfavorable. See McCormick, Law of Evidence, 534 (1954). See also: *Bentivoglio v. Ralston*, 447 Pa. 24, 288 A.2d 745 (1972), and *Commonwealth v. Wright*, 444 Pa. 536, 282 A.2d 323 (1971).

*Id.*, 453 Pa. at 305, 309 A.2d at 570. See also: *Commonwealth v. Manigault*, 501 Pa. 506, 510–511, 462 A.2d 239, 241 (1983); *Commonwealth v. Jones*, 455 Pa. 488, 495, 317 A.2d 233, 237 (1974); *Commonwealth v. Boyd*, 356 Pa.Super. 302, 306, 514 A.2d 623, 625 (1986). There are, however, several exceptions to the missing witness rule. These ex-

ceptions were listed by the Superior Court in *Commonwealth v. Harley*, 275 Pa.Super. 407, 418 A.2d 1354 (1980), as follows:

1. The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth;

2. The testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented;

3. The uncalled witness is equally available to both parties;

4. There is a satisfactory explanation as to why the party failed to call such a witness;

5. The witness is not available or not within the control of the party against whom the negative inference is desired; and,

6. The testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

*Id.*, 275 Pa.Superior Ct. at 413, 418 A.2d at 1357. See also: *Commonwealth v. Dorman*, 377 Pa.Super. 419, 431–432, 547 A.2d 757, 763 (1988). When one of these exceptions applies, a missing witness instruction is not required. See, e.g.: *Commonwealth v. Manigault, supra* (defendant not entitled to missing witness instruction where he had equal opportunity to question or call the witness); *Commonwealth v. Berry*, 355 Pa.Super. 243, 252, 513 A.2d 410, 414–415 (1986) (defendant not entitled to instruction where missing witnesses could have offered only cumulative testimony). Here, the trial court properly refused the defense request for a missing witness charge. Not only did the evidence place the stepfather in church at the time of the rape and murder and thus negative his possession of special information, but the record discloses that the witness was also available to the defense and could have been called by the defense if it had chosen to do so.

After a careful review of the record, we find no error requiring the granting of a new trial. The judgment of sentence, therefore, is

Affirmed.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting:

I am unable to join with the conclusion of the majority that Luis Miguel Sanchez' psychiatric records were properly admitted at trial and that his suicidal ideation could be used to infer his consciousness of guilt. In my view, the admission of his psychiatric records constitutes reversible error. Therefore, I dissent.

Our scope of review when determining whether evidence should have been admitted or excluded at trial is that we will not reverse the trial court on appeal absent a clear abuse of discretion. *Commonwealth v. Wagner*, 383 Pa.Super. 128, 556 A.2d 462 (1989); *Commonwealth v. Sweger*, 351 Pa.Super. 188, 505 A.2d 331 (1986), *alloc. denied*, 513 Pa. 634, 520 A.2d 1385 (1987). However, when an error occurs in the admission or the exclusion of evidence, reversal is required unless the Commonwealth establishes beyond a reasonable doubt that the error was harmless. *Commonwealth v. Lewis*, 528 Pa. 440, 598 A.2d 975 (1991); *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

Sanchez objects to the admission of his psychiatric records and the use of his suicidal ideation to infer consciousness of guilt on four different grounds: (1) evidence of Sanchez' suicidal ideation is irrelevant and prejudicial (2) the records are privileged under the psychiatrist-patient privilege, 42 Pa.C.S. § 5944; (3) the records contain expert medical opinion which may not be admitted under the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108; and (4) the records are inadmissible under the Mental Health Procedures Act, 50 P.S. § 7111.

First, Sanchez asserts that the evidence flowing from the admission of his psychiatric records to show his suicidal ideation or thoughts of suicide was irrelevant and prejudicial. I would find that any admission of these records into evidence constitutes reversible error. I, therefore, elect not to address whether the majority properly extended existing Pennsylvania law to permit mere thoughts of suicide to be used against an accused to infer his consciousness of guilt.

Second, Sanchez argues that the records from his stay in the jail psychiatric unit were privileged under 42 Pa.C.S. § 5944 and as such, were inadmissible to be used against him at trial. I agree.

42 Pa.C.S. § 5944 states:

**Confidential communications to psychiatrists or licensed psychologists.**

No psychiatrist or person who has been licensed under the act of March 23, 1972 (P.L. 136, No. 52), to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

This statute has been interpreted by our supreme court to constitute an absolute bar to the admission of testimony or records of a psychiatrist about a client. *Commonwealth v. Wilson/Aultman,* 529 Pa. 268, 602 A.2d 1290 (1992). This Court also recently addressed the scope of 42 Pa.C.S. § 5944 and held that the statute afforded an absolute privilege under which information acquired by a psychiatrist or psychologist in the course of his professional services for a client was not subject to disclosure. *Commonwealth v. Eck,* 413 Pa.Super. 538, 605 A.2d 1248 (1992). The statutory privilege also applies to records created in the course of the confidential relationship. *Id.,* 413 Pa.Super. at 545, 605 A.2d at 1252. Further, statements made to

those persons participating in a client's therapeutic regime have also been held to be confidential under 42 Pa.C.S. § 5944. *Kalenevitch v. Finger*, 407 Pa.Super. 431, 434–40, 595 A.2d 1224, 1226–28 (1991). (Statements made to nurse as agent of licensed psychologist held privileged.)

The legislative purpose for the absolute bar to the disclosure of psychiatric records is to promote and facilitate treatment of mental disorders. In *Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120 (1987) *alloc. denied*, 518 Pa. 617, 541 A.2d 744 (1988), this Court discussed the legislative intent in enacting 42 Pa.C.S. § 5944:

> Patient confidence is essential for effective treatment. Because the information revealed by the patient is extremely personal, the threat of disclosure to outsiders may cause the patient to hesitate or even refrain from seeking treatment. The privilege thus serves the public interest in promoting a society in which the general well-being of the citizenry is protected.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The privilege afforded by § 5944 was intended to inspire confidence in the client and encourage full disclosure to the psychologist. By preventing the latter from making public any information which would result in humiliation, embarrassment, or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure.

The majority asserts two grounds for rejecting Sanchez' assertion of privilege. First the majority holds that Sanchez failed to preserve this issue for review. I find from my review of the record that the statutory physician-patient privilege was properly asserted by Sanchez prior to introduction of the records at trial. N.T., July 27, 1990 at 6. Sanchez further asserted the physician-patient privilege in his post-trial motions which state in pertinent part:

> To the extent that prior case law established the notion that the doctor-patient privilege applies only to civil cases, that should be overturned. The Commonwealth should never be permitted to use the oral confidences that an

incarcerated accused intimates to his treating physician in a treatment setting as substantive evidence against him. Appellant's post-trial motions at 2–3.

Sanchez invoked the psychiatrist-patient privilege and articulated the public policy grounds which support it, in his post-trial motions. Moreover, rather than finding this issue waived, the trial court specifically interpreted Sanchez' assertion in post-trial motions to include the psychiatrist-patient privilege as defined in 42 Pa.C.S. § 5944. Trial Court Opinion at 9. I find that while Sanchez fails to specify the statutory section under which the psychiatrist-patient privilege can be found, he has preserved the issue of privilege for our review.

The majority next finds that even if the psychiatrist-patient privilege had not been waived, it is inapplicable in criminal cases. This finding is contrary to the text of the statute itself which states that the privilege is applicable "in any civil or criminal matter". 42 Pa.C.S. § 5944. In *Commonwealth v. Kennedy*, 413 Pa.Super. 95, 604 A.2d 1036 (1992), we discussed whether the files of a sexual abuse victim could be disclosed to the defendant to aid in his defense, holding that the defendant had no constitutional right to gain access to the records, as the statute provides an absolute bar to disclosure. *Id.*, 413 Pa.Super. at 115–116, 604 A.2d at 1047.

Our previous holdings under 42 Pa.C.S. § 5944 have prevented a criminal defendant from obtaining access to a victim's files to aid in his defense. *See e.g. Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120 (1987), *alloc. denied*, 518 Pa. 617, 541 A.2d 744 (1988). However, since the statute provides an absolute bar to disclosure, it must follow that neither may a prosecutor be permitted access to the psychiatric files of a defendant to aid in his prosecution.

Two cases cited by the majority to support the proposition that there is no psychiatrist-patient privilege in criminal cases, *Commonwealth v. Edwards*, 318 Pa. 1, 178 A. 20 (1935) and *Commonwealth v. Sykes*, 353 Pa. 392, 45 A.2d 43 (1946) interpret the Act of June 7, 1907, P.L. 462 (now 42

Pa.C.S. § 5929) and do not apply in this case. These § 5929 cases indicate that the statute only provides a physician-patient privilege in civil cases. These cases, while correctly setting forth the law under 42 Pa.C.S. § 5929, do not apply to 42 Pa.C.S. § 5944, a statute yet to be enacted at the time of their writing. These statutes are different in their scope. § 5929 provides for a limited privilege that denies admission of physician-patient information that would tend to blacken the character of a party in a civil case. However, § 5944, the statute to be applied in this case, provides an absolute prohibition to the admission of evidence that flows from the psychiatrist-patient relationship regardless of the type of case being litigated.

The majority also cites *Commonwealth v. Petrino,* 332 Pa.Super. 13, 480 A.2d 1160 (1984), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1984), in which this Court interpreted the physician-patient privilege to be found only in 42 Pa.C.S. § 5929 and not in 42 Pa.C.S. § 5944. In *Petrino,* this Court rearticulated that § 5929 applies only in civil cases. In 1989, however, § 5944 was amended to include psychiatrists as well as psychologists. Thus, *Petrino* remains an accurate statement only as to § 5929.

Finally, the majority relies on *Commonwealth v. Moyer,* 407 Pa.Super. 336, 595 A.2d 1177 (1991), *alloc. denied,* 529 Pa. 656, 604 A.2d 248 (1991), which cites to the above three cases as authority for the proposition that no "common law" physician-patient privilege applies in criminal cases. This lack of privilege between physicians and patients in criminal cases as cited by the majority, results not from a "common law" analysis of such privilege but rather from court interpretation of a specific statutory privilege under § 5929. These cited cases are not relevant in the present case. The information in Sanchez' psychiatric records is barred from admission under 42 Pa.C.S. § 5944 not by 42 Pa.C.S. § 5929.

In his third argument, Sanchez objects to the fact that the trial court admitted his psychiatric records under the Uniform Business Records as Evidence Act. 42 Pa.C.S. § 6108.

Hospital records are admissible to show the fact of hospitalization, treatment prescribed, and symptoms given. *Commonwealth v. DiGiacomo*, 463 Pa. 449, 345 A.2d 605 (1975). If the psychiatric records were not privileged, perhaps they could be admitted to show that Sanchez did receive treatment at the the prison psychiatric unit. Brief for Appellant at 33. However, to admit the medical opinion contained in the records requires the doctor to be available for cross-examination. *Id.*, 463 Pa. at 456, 345 A.2d at 608. *See also Commonwealth v. Keeney*, 367 Pa.Super. 16, 532 A.2d 33 (1987).

Here, the diagnostic impressions or opinions of the admitting psychiatrist were read to the jury over Sanchez' objection. The physician's opinion stated:

At the time of admission he was sad, motor activity was decreased. Speech was slow and soft and he was withdrawn. Flow of thought was slow. Mood revealed anxiety and depression. There were suicidal thoughts and he felt guilty and worthless. He denied auditory hallucinations. Sensorium, intelligen[ce] and insight were intact.

N.T., July 30, 1990 at 26.

The psychiatrist's notes reflected his expert impressions as to the state of Sanchez' psyche, rather than merely reciting the symptoms which Sanchez reported. These comments were improperly admitted; they constituted expert testimony upon which Sanchez could not cross-examine the expert witness. *See DiGiacomo, supra; Commonwealth v. Hemingway*, 369 Pa.Super. 112, 119, 534 A.2d 1104, 1108 (1987); *Morris v. Moss*, 290 Pa.Super. 587, 593, 435 A.2d 184, 187 (1981). Under our adversary system, cross-examination exposes any possible errors and omissions in the preparation of the report and tests the accuracy of the opinions upon which the report was based. *Commonwealth v. Hemingway*, 369 Pa.Super. at 119, 534 A.2d at 1108.

The purpose of the Uniform Business Records as Evidence Act is to permit the introduction of records that are

inherently reliable. This Court in *Commonwealth v. Seville*, 266 Pa.Super. 587, 405 A.2d 1262 (1979) stated:

> No such doubt as to reliability and accuracy are entertained when a record is offered merely to prove facts, such as the event of hospitalization, treatment prescribed, symptoms given or the existence of some readily ascertained substance or chemical within the body.

Medical records cease to be inherently reliable when they report the impressions of an individual that are not objectively ascertainable. *See Commonwealth v. DiGiacomo, supra; Commonwealth v. McCloud,* 457 Pa. 310, 322 A.2d 653 (1974); *In re Involuntary Termination of Parental Rights,* 449 Pa. 543, 297 A.2d 117 (1972). As such, the trial court erred when it permitted the jury to hear the psychiatrist's comments written in Sanchez' medical record. The admission of medical opinion evidence presented in this case and used by the prosecution to evidence Sanchez' consciousness of guilt constitutes reversible error. The judgment in this case cannot be permitted to stand.

Fourth, Sanchez claims that his psychiatric records should have been excluded under the Mental Health Procedures Act, 50 P.S. § 7111. The majority finds that this claim is waived by Sanchez' failure to specifically assert this ground in post-trial motions. Even though this issue is not stated with particularity in post-trial motions, I would find the issue to be sufficiently preserved for review. Sanchez objected at trial to the admission of the records. The trial court understood that Sanchez was objecting to the admission of his medical records and their use as evidence of his suicidal ideation. Moreover, the trial court granted him a continuing objection during the introduction of the records at trial. N.T., July 30, 1990 at 20. While the language used in post-trial motions was inartful, it sufficed to inform the trial court that the Mental Health Procedures Act was at issue in the case. The trial court proceeded to address this issue substantively in its opinion. See Trial Court Opinion at 9–10. *See Commonwealth v. Metz,* 412 Pa.Super. 100, 104, n. 1, 602 A.2d 1328, 1330, n. 1 (1992).

In *Kurtas v. Kurtas*, 521 Pa. 105, 555 A.2d 804 (1989), our supreme court addressed whether our Court should consider an issue waived, due to a procedural error, when the trial court chose to address an issue on the merits. The court in *Kurtas* stated:

> We are cognizant that at times the rigid application of our rules does not serve the intended purpose of justice and fairness but rather results in a harsh or even unjust consequence. For this reason, we promulgated Pa.R.C.P. 126 wherein we granted to the trial court latitude to overlook any procedural defect which does not prejudice the rights of a party. These procedural rules are not jurisdictional limitations and the failure to comply with such rules does not divest the trial court of such jurisdiction. By allowing a trial court to overlook a procedural defect does not in any way in and of itself alter the jurisdiction of that court.

Id., 521 Pa. at 109, 555 A.2d at 806.

In *Kurtas*, our supreme court reversed a case in which this Court had stated that the issues were waived for failure to file timely post-trial motions. The supreme court found that when the trial court had addressed the issues raised in the untimely motions on the merits, this Court could not thereafter treat those issues as waived. *Id.*, 521 Pa. at 109, 555 A.2d at 806.

I would apply the reasoning in *Kurtas* to the present facts. Here, Sanchez made general allegations of error at trial and in post-trial motions based on the privileged nature of his psychiatric files. Since the trial court chose to address this issue, and its consideration merely adds another ground for reversal on a previously decided issue, there is no prejudice. Therefore, I will address this issue on the merits.

The Mental Health Procedures Act (MHPA), Act of July 9, 1976, P.L. 817, No. 143, § 111, 50 P.S. § 7111 states:

> All documents concerning persons in treatment shall be kept confidential and, without the person's written con-

sent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;

(2) the county administrator pursuant to § 110;

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal Rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. This shall not restrict the collection and analysis of clinical or statistical data by the county administrator or the facility so long as the use and dissemination of such data does not identify individual patients. Nothing herein shall be construed to conflict with section 8 of the act of April 14, 1972 (P.L. 221, No. 63), known as the "Pennsylvania Drug and Alcohol Abuse Control Act."

In the present case, Sanchez' records were obtained pursuant to a subpoena by the district attorney. There is no exception in the MHPA under which Sanchez' records may be obtained without his consent. The Mental Health Procedures Act is to be strictly construed. *Commonwealth v. Blaker*, 293 Pa.Super. 391, 446 A.2d 976 (1981). The MHPA provides on its face that no psychiatric records may be revealed without the express written consent of the patient, except under limited circumstances. In *Commonwealth v. Moyer*, 407 Pa.Super. 336, 595 A.2d 1177 (1991), *alloc. denied*, 529 Pa. 656, 604 A.2d 248, discussing the MHPA and its application in criminal cases, we held that a patient's inpatient mental health records may be used by a court *only when the legal proceedings are within the framework* of the MHPA, that is, involuntary and voluntary mental health commitment proceedings. *Id.*, 407 Pa.Superior Ct. at 341, 595 A.2d at 1179. In *Moyer*, a criminal defendant's psychiatric records revealing evidence of his

suicidal ideation, depression, and his thoughts about the crime, were read to the jury. *Id.*, 407 Pa.Superior Ct. at 338, 595 A.2d at 1178. In *Moyer*, this Court found such an error grounds for reversal of the sentence and the grant of a new trial. *Id.*, 407 Pa.Superior Ct. at 342, 595 A.2d at 1180.

In the present case, Sanchez' psychiatric records were read to the jury absent defense permission and over defense objection. In my view, the admission of this evidence is in clear violation of the MHPA. I would reverse the judgment of sentence and grant a new trial.

I would find that the trial court erred in the admission of Sanchez' medical records into evidence on three grounds. First, the admission of the record violated the psychiatrist-patient privilege articulated in 42 Pa.C.S. § 5944. Second, the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108, does not apply to the medical opinion contained in Sanchez' hospital records and renders it inadmissible. Third, since Sanchez did not consent to the use of the records, they must be excluded under the Mental Health Procedures Act, 50 P.S. § 7111. Accordingly, for the foregoing reasons, I would reverse the judgment of sentence and grant a new trial. Therefore, I respectfully dissent.