Belknap
No. 85-120

### THE STATE OF NEW HAMPSHIRE

v.

### RUSSELL BROWN

October 3, 1986

*Stephen E. Merrill*, attorney general (*Andrew L. Isaac*, assistant attorney general, on the brief, and *T. David Plourde*, assistant attorney general, orally), for the State.

*Schapira and Green P.A.*, of Manchester (*Andru H. Volinsky* on the brief and orally), for the defendant.

SOUTER, J.   The defendant was convicted in the Superior Court (*O'Neil*, J.) under indictments charging him with attempted murder and first degree assault, against each of which he defended on the theory of accident. In this appeal he claims three grounds for reversal: (1) a violation of his due process rights by the admission of evidence indicating that in the period after receipt of *Miranda* warnings he failed to apologize to the victim for injuring him; (2) erroneous instructions on the requisite state of mind for attempted murder and on the significance of certain evidence offered to prove the mental state; and (3) error in denying a motion to dismiss the attempted murder indictment for insufficient evidence. We affirm.

From the evidence it could be found that the defendant had been romantically involved with one Alicia Kirk until March, 1984, after which she transferred her attentions to the victim, James Barrett. Soon thereafter, the defendant observed that Barrett was enjoying all the "fringe benefits" and said "I'd like to blow his balls off." In a later conversation about Barrett, the defendant said "[t]he bastard ought to be shot."

On the evening of May 9, 1984, the defendant went to the house in Belmont where Barrett was then living with Kirk. The defendant was armed with a sawed-off shotgun, which he said he had cut down so that he could use it to kill himself. He testified that he took the gun with him when he went to the house in order to convince Kirk that he intended to commit suicide, hoping that Kirk would dissuade him from doing so.

At the kitchen door of the house he encountered Barrett, along with Kirk and James Vappi. The circumstantial evidence bearing on the defendant's intentions at that moment was conflicting. There was testimony indicating that his immediate object was to get past Barrett and into the house. The defendant himself testified that when Barrett stepped towards him he backed up, causing the gun to fall accidentally from his shoulder and go off. This testimony was consistent with evidence that after the gun discharged, causing a

large wound in one side of Barrett's groin, the defendant exclaimed that he thought the safety was on. The victim, however, testified that the defendant appeared to be a determined man, and Vappi testified that he intentionally brought the gun up to fire it. This was consistent with testimony that, after shooting Barrett, the defendant pumped another shell into the chamber of the gun and inspected Barrett's bleeding wound before leaving at Barrett's request.

After stopping in a local restaurant, the defendant returned to his own house in Tilton, where the police were waiting. He fled in his car, leading the police on a chase to New Hampton, where they arrested him. The defendant testified that he attempted suicide in the car just before the moment of arrest, but failed when the gun did not fire.

Barrett was hospitalized, and the defendant was jailed. In July, while Barrett was still in the hospital, the defendant was freed on bail subject to the condition that he not contact either the victim or Kirk.

At trial, defense counsel's opening statement indicated that the theory of defense was accident. The prosecutor attempted to discredit this theory by addressing the following questions to the victim:

| | |
|---|---|
| "Q. | How long were you in the hospital? |
| A. | Two months. |
| Q. | How long were you in the Intensive Care? |
| A. | Ten or eleven days. |
| Q. | While you were in the hospital, did the defendant ever visit you? |
| A. | No. |
| Q. | Ever call? |
| A. | No. |
| Q. | Ever write? |
| A. | No. |
| Q. | Did you ever receive any indication from him that— |
| [Defense Counsel]: | Your Honor, at this point I'm going to object, and I'd like to approach the bench, if I can. I think these questions are unfair. I'll say it right here. These questions are unfair. |

[Prosecutor]: Your Honor, I believe this is improper procedure. If he has a statement to make, it's made to the Judge.

[Court]: Wait a minute. Hold it just a second. I'm not too sure I agree with that procedure. Whatever you have got to say, say it in front of the jury. If it's something that's highly inflammatory, then we will come to the bench, otherwise the jury has the same right to [hear] it as everybody else in this public court.

[Defense Counsel]: I object to that line of questioning. My Brother knows fully well that my client had been arrested that night, that he was in jail, and that they had him under indictment; that while Mr. Barrett was in the hospital and he was represented by counsel, they charged him with this crime. I think that's wrong to allow him to make any comment concerning my client making any statement to this man at all.

. . . .

[Prosecutor]: This man is not law enforcement. There is nothing incriminating if this is an accident, as my Brother has represented to the jury, about saying I'm sorry. And that never happened.

[Objection overruled, exception noted.]

Q. Did you hear anything from the defendant referring to what he had done to you at all?

A. No.

Q. To this day has he expressed to you any regret for what happened to you?

A. No."

The defendant's claim that this testimony was inadmissible presents the first issue on appeal.

The relevance of a person's silence arises from its context. When an individual unintentionally injures another, and there is an opportunity to communicate, it is reasonable to expect some expression of

regret. Silence in such circumstances, on the other hand, has some tendency to indicate that there is no regret because the injury was intended.

■ This theory of relevance was the basis of defense counsel's objection to the testimony about the defendant's failure to apologize. By stressing that the victim was in the hospital and the defendant was in jail charged with a crime, defense counsel argued in effect that the defendant had no opportunity to make an apology. We think it is a proper response, however, that an apology need not have been made in person and opportunity was therefore not entirely lacking. Although the points raised in the defendant's argument certainly affect the weight to be given to the evidence of his silence, the silence was still relevant to the defense theory of accident and a proper subject of testimony at trial.

Because defense counsel urged no other reasons to support his exception at trial, we might properly end our consideration of the first issue here. *See* N.H. R. Ev. 103(b)(1) (grounds for objection to evidence are waived unless explicitly stated). This is a pre-Rule 103(b)(1) case, however, and because appellate counsel's further arguments in support of the defendant's exception concern the relevance of the testimony, we will go on to consider the further grounds now raised before us.

■ First, the defendant points out that the July 1984 bail order forbade him from communicating with the victim and thus deprived him of a legal opportunity to apologize. Though a sound argument as to the period after the bail order, it has no application to the period from the date of the shooting in early May to the imposition of the bail order in mid-July. This objection would at most have required the State to confine its final two questions to the pre-bail period. We are satisfied in any case that the over-breadth of those questions was at most harmless error, because defense counsel adequately brought both the terms and the date of the bail order to the jury's attention, through testimony later in the trial. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *State v. Staples*, 121 N.H. 959, 962, 437 A.2d 266, 267 (1981).

The second new ground raised on appeal, and going to relevance, has a constitutional dimension and is said to rest on *Doyle v. Ohio*, 426 U.S. 610 (1976). A defendant's silence is seldom subject to only one interpretation; one source of its ambiguity may be the privilege against compelled self-incrimination, guaranteed to a defendant as against the government by the fifth and fourteenth amendments of the National Constitution and by part I, article 15 of the Constitu-

tion of New Hampshire. *See Griffin v. California*, 380 U.S. 609, 611 (1965); *State v. Cormier*, 127 N.H. 253, 255, 499 A.2d 986, 988 (1985); *State v. Arsenault*, 115 N.H. 109, 112, 336 A.2d 244, 246 (1975). When directed towards the police, therefore, a defendant's silence may be probative on a material issue, or it may instead reflect a decision to invoke his constitutional privilege to maintain just such silence. The Supreme Court of the United States has held that such silence passes from being ambiguous to "insolubly ambiguous" once the defendant receives the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966) (explaining the privilege to remain silent, and to have a lawyer present during any questioning). *Doyle, supra* at 617. The Court reasoned that evidentiary use of post-*Miranda* silence would violate a representation implicit in the warnings, that a defendant will not be penalized for invoking the privilege. *Doyle, supra* at 618. Use in such circumstances would be so fundamentally unfair as to violate due process. *Doyle, supra* at 618. We might add that it would also violate an equally implicit representation that the defendant will not be required to waive his right to silence at trial in order to explain his constitutionally protected silence before trial.

The Court clarified the scope of *Doyle* in *Fletcher v. Weir*, 455 U.S. 603 (1982), which held that no fundamental unfairness results from admitting evidence of a defendant's silence preceding the *Miranda* warning. *Id.* at 607. "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Id.*; *see Wainwright v. Greenfield*, 106 S. Ct. 634, 638 (1986); *South Dakota v. Neville*, 459 U.S. 553, 564–65 (1983); *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S. Ct. 2124, 2129–30 (1980). Thus, before receipt of the warnings, the ambiguity of the defendant's silence does not rise to the "insoluble" level, and introduction of evidence of silence does not violate any implicit assurance in the *Miranda* warnings that the invocation of the constitutional privilege will not be penalized. It is, of course, always possible that a defendant's silence toward the police reflects his knowledge of his constitutional privilege even before he receives *Miranda* warnings. It is clear from *Fletcher*, however, that this possibility does not require that evidence of his silence be excluded, at least when he takes the stand and places himself in a position to explain the significance of his silence. *Id.* at 606–07.

In short, *Doyle*'s exclusion of evidence of silence rested on the enforcement of the constitutional privilege to remain silent, and *Fletcher* teaches that even this policy mandates exclusion only if a

defendant has received the assurance implicit in *Miranda* warnings. Neither case yields a shred of support for the defendant's position.

Quite simply, neither the *Miranda* warnings nor the fifth and fourteenth amendments provide a defendant with a privilege of silence that may be asserted against another individual acting in his private capacity. A defendant may not be under any obligation to respond to another person acting in a private capacity, of course, and if he does so under compulsion his responses may be excludable from evidence. But this case presents no such issue. What is significant here is that a defendant who maintains his silence as against another private party does not thereby exercise the fifth and fourteenth amendment privilege that is subject to the explicit and implicit representations of the *Miranda* warnings, and *Doyle* is no bar to the evidentiary use of such silence. Although it is always possible that a defendant may believe that he does have a fifth amendment privilege assertable against a private person, that error requires no constitutional vindication beyond the opportunity to explain it to a finder of fact at trial.

This conclusion not only follows from *Doyle* and *Fletcher*; it was obliquely recognized in the opinion in *Harris v. New York*, 401 U.S. 222 (1971), which held that statements of a defendant obtained without compliance with *Miranda* were admissible for the purpose of impeachment. *Id.* at 226. The Court observed that if the defendant had made a statement to a "third party" that was inconsistent with his trial testimony, there would be no basis in *Miranda* to hold the earlier statement inadmissible to impeach him, regardless of the government's failure to comply with *Miranda. Id.* at 225–26. The statement to the third party would not have been protected, because its admissibility would not have required the waiver of a *Miranda* privilege; on like reasoning, silence toward a third party is not inadmissible, because it could not have been the exercise of a *Miranda* privilege. *See United States v. Nabors,* 707 F.2d 1294 (11th Cir. 1983).

This reasoning disposes of the federal claim. In dealing with the State claim, we recognize that article 15 and the fifth amendment are similar in scope, *Cormier,* 127 N.H. at 255, 499 A.2d at 988, and we accept the reasoning of *Doyle* and *Fletcher* as persuasive. *See State v. Ball,* 124 N.H. 226, 231, 471 A.2d 347, 350 (1983); *see also Michigan v. Long,* 463 U.S. 1032, 1040–41 (1983). It follows that the defendant's State privilege against compelled self-incrimination has no more reference to private third parties than its federal counterpart. Accordingly, we conclude that once a defendant has

chosen to take the stand, neither article 15 nor the fifth and fourteenth amendments require the exclusion of evidence that a defendant maintained silence toward a private third person.

■ The defendant's second issue comprises three claims of error in the jury instructions given on the attempted murder charge. The first is that the court inadequately explained that the State must prove that the defendant acted with deliberation and premeditation in attempting to kill the victim. We need not pause over this argument, however. It rests on the mistaken assumption that we rejected in *State v. Allen*, 128 N.H. 390, 514 A.2d 1263 (1986), where we held that attempted murder is a generic crime, the sole mental element of which is a purpose to cause the victim's death. There was, therefore, no need to prove premeditation and deliberation, and the trial court's allusions to these elements could not have prejudiced the defendant.

Next, the defendant claims error in the jury charge on that purposeful state of mind that attempted murder does entail. The court addressed this element in the following instructions, which we designate with paragraph letters for easy reference below:

A "A purpose to kill may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. In the absence of an explanatory or mitigating circumstance or circumstances, you may infer that a person who uses a deadly weapon such as a shotgun, aimed at the vital part of a person's body is aware of the natural and probable consequences of his act."

B "That is, murder is purposely causing the death of another. Now, a person acts purposely with respect to a material element of an offense when his conscious object is to cause the result or engage in the conduct that comprises the element. In this case the State must prove it was the defendant's object to kill James Barrett."

C "Now, again, in order for the State to sustain its burden, it's required to prove that Russell Brown purposely shot James Barrett and he did so with the purpose that the crime of murder be committed. This means that the State must prove that the defendant's conscious object was to shoot James Barrett and, by shooting him, to cause his death."

D  "Now, to prove that the defendant acted purposely the State must show that the defendant knew what he was doing and did so with the purpose to kill."

The defendant objected to the reference to the awareness of the natural consequences of a person's act, contained in paragraph A, and the charge that the State must prove that the defendant knew what he was doing, contained in paragraph D. The defendant argues, in effect, that these instructions charged that the State need only prove that the defendant acted knowingly, *i.e.*, with an awareness of the nature of his conduct, RSA 626:2, II(b), rather than purposely, *i.e.*, with a conscious object to kill the victim, RSA 626:2, II(a); RSA 629:1, I; *State v. Allen supra.*

■■  It is elementary that a claim of erroneous jury instruction must be evaluated by reading the instruction in the context of the whole charge. *Poulin v. Provost*, 114 N.H. 263, 265, 319 A.2d 296, 298 (1974). Although a particular instruction may be erroneous in isolation, this is no ground for a new trial if the charge taken as a whole could not have conveyed an erroneous conception of the law. *Id.*

■  We believe there is no error in the instructions when read reasonably and taken as a whole. Paragraphs B and C correctly instruct that the State must prove that the defendant acted with the conscious object to kill the victim. Although paragraph A instructed that a person who uses a deadly weapon aimed at a vital spot may be found to be aware of the natural consequences of his acts, the instruction did not state that proof of such awareness, without more, would satisfy the requisite mental element. While paragraph A might have left that impression if it had stood alone, it is unreasonable to suppose that the instructions in paragraphs B and C would not have corrected any such misperception.

Nor do we see any likelihood that paragraph D misled the jurors. Although that paragraph did instruct that the State must prove that the defendant knew what he was doing, that statement was followed immediately by a final instruction that the defendant must have acted with a purpose to kill. This could not have misled the jury.

We therefore find no reversible error here. (We do not, however, recommend the discursive approach exemplified in the quotations. It would have been preferable to describe the mental element concisely as a conscious object to kill the victim.)

■■  The defendant's final objection to the instructions is that the court was mistaken in charging that the defendant's alleged

attempt at suicide after the crime could be taken to indicate consciousness of guilt. This was not erroneous, however. Just as a jury may consider flight after a crime as showing consciousness of guilt, *State v. Glidden*, 123 N.H. 126, 134, 459 A.2d 1136, 1141 (1983), it may also consider attempted suicide, as an "attempt to flee and escape forever from the temporal consequences of one's misdeed." 2 J. WIGMORE, EVIDENCE § 276, at 131 (Chadbourn rev. 1979). The defendant's allegation that he considered suicide before the shooting does not affect the application of this rule. Evidence of suicidal thoughts before committing the crime would, at most, affect the weight to be given to the evidence of suicidal conduct after the event.

We now reach the defendant's ultimate claim on appeal, that the trial court should have dismissed the attempted murder indictment at the close of the case, because there was insufficient evidence to infer a conscious object to kill. Under the familiar standard for passing on such a claim, the defendant has the burden to demonstrate that no rational trier of fact could have found the disputed element to exist beyond a reasonable doubt, considering all the evidence in the light most favorable to the prosecution. *State v. Martin*, 121 N.H. 1032, 1033–34, 437 A.2d 308, 309 (1981); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). It is a burden that the defendant has no serious chance to carry in this case, as he indicated himself by his novel suggestion that we should disregard the evidence of the statements he made before the shooting. This might or might not have been a sensible proposal to the jury, but it has no place in considering evidentiary sufficiency.

The facts stated at the beginning of this opinion indicate that the jury heard evidence that the gun did not fire accidentally, that the defendant inflicted a potentially fatal wound exactly where he earlier had said it would be appropriate, and that he showed no concern that the bleeding victim might die without prompt medical help. There is no serious question of evidentiary sufficiency on this record.

Before closing this opinion, we ought to note one further point of trial procedure, even though the defendant has not directly raised it by a claim of error. Defense counsel should have been allowed to approach the bench when arguing the objection to admission of the testimony about the defendant's silence. The version of Superior Court Rule 66 in force at the time of the trial contemplated that counsel would make only the most tersely stated objections in open court unless the trial judge ordered otherwise. The rule's intent

was to save time and avoid reversible error: jurors can not be expected to decide cases on admissible evidence alone if they have heard offers of proof and arguments on objections to inadmissible evidence that the court ultimately keeps out. The rule in its current form underscores its object by providing explicitly that counsel may approach the bench to elaborate on objections. SUPER. CT. R. 66(a) (effective July 1, 1985).

*Affirmed.*

All concurred.