# Supreme Court of Florida

_____

No. SC12-1161
_____

**CARL DAUSCH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 12, 2014]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. <u>See</u> art. V, § 3(b)(1), Fla. Const. Carl Dausch was convicted of the murder and aggravated battery of Adrian Mobley. Because the record lacks sufficient evidence of the perpetrator's identity, we vacate Dausch's convictions and sentences.

## PROCEDURAL HISTORY

The murder of Adrian Mobley occurred on July 15, 1987. More than fifteen years later, the DNA testing of evidence obtained during the initial murder investigation led to Dausch as a suspect. In 2006, Dausch was indicted for the

first-degree murder and sexual battery of Mobley. In 2011, a jury convicted Dausch of first-degree murder as charged and aggravated battery as a lesser included offense of sexual battery. In 2012, Dausch was sentenced to death for the murder conviction and to ten years of imprisonment for the aggravated battery. He now appeals his convictions and sentences.

## ISSUES ON APPEAL

On appeal, Dausch raises eleven issues: (1) whether the trial court erred when it denied Dausch's motion for judgment of acquittal; (2) whether the trial court erred when it denied Dausch's motion for mistrial due to the testimony of an Indiana law enforcement officer; (3) whether the trial court erred when it allowed the introduction of evidence that Dausch attempted suicide, and whether the court further erred when it refused to allow Dausch to offer a suicide letter in rebuttal; (4) whether the trial court erred when it denied Dausch's motion for mistrial and a new penalty phase jury due to the misconduct of a juror who conducted improper internet searches before the penalty phase began; (5) whether Dausch's convictions for first-degree murder and aggravated battery resulted in double jeopardy; (6) whether the trial court erred when it found that the murder was especially heinous, atrocious, or cruel (HAC); (7) whether the trial court improperly instructed the jurors to consider aggravating circumstances that were not supported by competent substantial evidence; (8) whether the trial court erred when it

assigned minimal weight to mitigating evidence that Dausch suffers from organic brain damage; (9) whether the death sentence is proportional; (10) whether the standard penalty phase jury instructions violated due process; and (11) whether the trial court erred when it denied relief under Ring v. Arizona, 536 U.S. 584 (2002). Because we conclude that the State did not introduce competent substantial evidence of the perpetrator's identity, our discussion is limited to the sufficiency of the evidence in this case.

## FACTS

This was a cold case. The victim, Adrian Mobley, was murdered in July 1987. For more than fifteen years, there was no known connection between the physical evidence and any suspect, until DNA testing eventually led investigators to Dausch. We now turn to the circumstantial evidence on which the State relied to convict Dausch.

### The Murder of Adrian Mobley

On the morning of July 15, 1987, the body of Adrian Mobley was found on the side of County Road 475 in Sumter County. Mobley's body was hogtied with a sheet and severely beaten. His body was found clothed, but his wallet and car were missing. Several hours later, Mobley's car was spotted near Interstate 65 in Whitehouse, Tennessee. An eyewitness saw a man who generally resembled

Dausch abandon the car and walk toward the interstate. The eyewitness contacted the local police department and reported what he saw.

Tennessee law enforcement quickly realized that the abandoned car belonged to a murder victim in Florida and seized the car. The car was processed for evidence, and latent fingerprints were retrieved from the car's exterior and from a cigarette lighter wrapper found inside of the car. At that time, there were no known fingerprints for comparison. Meanwhile, in Florida, an autopsy was conducted of Mobley's body, which revealed that he died as a result of blunt trauma to his head and upper chest. The medical examiner obtained anal swabs that revealed the presence of semen, although Mobley's body revealed no evidence of sexual trauma.

### Dausch as a Suspect

More than fifteen years later, in October 2002, pursuant to a grant that funded DNA testing, the Florida Department of Law Enforcement (FDLE) obtained the anal swabs from the Sumter County Sheriff's Office for further analysis. FDLE forwarded the swabs to Fairfax Identity Laboratories (Fairfax) in Virginia in order to obtain DNA profiles. Later, cigarette butts also retrieved from Mobley's car were also forwarded to Fairfax for DNA profiling. In 2003, Fairfax extracted DNA profiles from the anal swabs and the cigarette butts. The DNA profile of the anal swabs revealed a mixture of DNA. Fairfax also obtained

- 4 -

multiple DNA profiles from the cigarette butts. Fairfax subsequently forwarded its data to FDLE.

Once received by FDLE, the data was reviewed by Dr. Robin Ragsdale, a DNA analyst. Dr. Ragsdale confirmed the data, and the data was entered into the National DNA Database. Subsequently, FDLE received information from the database that identified Dausch as a possible suspect. To follow up on this information, in 2004, Sheriff's detectives traveled from Sumter County to Indianapolis, Indiana, to obtain buccal swabs, fingerprints, and hair samples from Dausch. While in Indianapolis, the Sumter County detectives also met with Rebecca Kelly, the mother of Dausch's daughter. Kelly gave the detectives a Flagler Beach, Florida, postcard that Dausch mailed to his daughter from Florida on July 8, 1987. Detectives also obtained handwriting samples from Dausch in order to compare the samples to the handwriting on the Flagler Beach postcard. An FDLE forensic document examiner compared Dausch's handwriting samples with the handwriting on the postcard and concluded that the handwriting on the postcard was probably that of Dausch.

DNA Analysis

The buccal swabs enabled law enforcement to compare DNA obtained from Mobley's body and his car with Dausch's DNA. After Dr. Ragsdale extracted a DNA profile from the buccal swabs provided by Dausch, she performed a Short

Tandem Repeat (STR) DNA analysis of the DNA extracted from the cigarette butts. Dr. Ragsdale's comparison of Dausch's DNA with the DNA extracted from the cigarette butts revealed matches at all thirteen loci. Dr. Ragsdale testified: "[t]he frequency of occurrence of the DNA profile from the cigarette butt is approximately one in two hundred and thirty trillion Caucasians [1 in 230 trillion], one in two point three quadrillion African Americans [1 in 2.3 quadrillion], and one in eight hundred and seventy trillion [1 in 870 trillion] Southeastern Hispanics."

Dr. Ragsdale also performed an STR analysis of the DNA that Fairfax extracted from the anal swabs. Dr. Ragsdale's initial analysis identified Dausch as a possible contributor on four of thirteen loci. Dr. Ragsdale concluded that "[t]he frequency at which you would expect someone to contribute to this mixture would be one in forty-six Caucasians [1 in 46], one in a hundred and thirty-nine African Americans [1 in 139], and one in a hundred and fifteen Southeastern Hispanics [1 in 115]."

Later, Dr. Ragsdale re-extracted DNA from the anal swabs and identified a foreign profile that was consistent with Dausch's profile and matched at two loci. Based on the re-extraction, Dr. Ragsdale testified that "the frequency at which you would expect to find this profile for these two areas of DNA in any given population, are approximately one in two hundred ninety Caucasians [1 in 290],

one in seven hundred and ninety African Americans [1 in 790] and one in approximately five hundred Southeastern Hispanics [1 in 500]." Dr. Ragsdale testified that the deviation of all of the statistics is tenfold.

Dr. Ragsdale also analyzed the two semen stains found on the sheet that was used to tie Mobley's hands and feet. Her analysis revealed that Dausch was not a source of those stains.[1] Dr. Ragsdale's analysis of the DNA from Mobley's fingernail scrapings also excluded Dausch as a contributor.

Fingerprint Analysis

The latent fingerprints obtained during the murder investigation were compared to the known fingerprints of Dausch, and the fingerprint retrieved from the cigarette lighter wrapper was matched to Dausch's fingerprints. Additionally, the palm prints on the rear driver's side door and above the rear driver's side door matched those of Dausch.

However, Dausch's fingerprints were not found in the driver's immediate area, such as on the steering wheel, radio, gear shift, or door handle. Other items retrieved from the interior of the vehicle and from the crime scene were not linked to Dausch. Additionally, although latent fingerprints of value were identified on

---

1. Evidence presented by the defense also excluded the victim, Mobley, as the source of the stains.

Mobley's wallet after it was found near the Florida/Georgia border, the fingerprints did not belong to Dausch.

## Pre-trial Suicide Attempt

Although Dausch's trial was held in December 2011, a trial date had been set for April of that year. On April 3, 2011, on the eve of jury selection, Dausch attempted to commit suicide. He was found unresponsive in his cell in the Sumter County Jail. Several strips of bed linens were tied around his neck. The State relied on this evidence as proof of Dausch's consciousness of guilt.

## The Defense Theory

Dausch's theory of innocence was that he hitchhiked a ride with the person who actually stole Mobley's car. Dausch's former brother-in-law testified that in July 1987, he, Dausch, and other family members and friends traveled from Indiana to Florida in a recreational vehicle and vacationed in Flagler Beach and Tampa. He testified that at the end of their vacation, Dausch left Flagler Beach with the group, and they traveled north on Interstate 95 until they reached Interstate 10 and began traveling west. Dausch, who was anxious to get home to Indianapolis, parted from the group after reaching a rest area on Interstate 10. We now turn to our analysis of the sufficiency of the State's evidence.

# ANALYSIS

It is a fundamental requirement of our criminal justice system that at trial, the State bears the burden of proof beyond a reasonable doubt. In order to satisfy its burden, the State must prove beyond a reasonable doubt every element of the crime charged. Ballard v. State, 923 So. 2d 475, 485 (Fla. 2006). In this case, in order to prove first-degree premeditated murder, the State was required to prove that the victim, Mobley, is dead, that the death was caused by the criminal act of the defendant, Dausch, and that the killing of the victim was premeditated. Fla. Std. Jury Instr. (Crim.) 7.2.[2]

Once the State obtains a conviction, this Court bears the responsibility of ensuring that in every capital case, sufficient evidence exists in the record to support the conviction. Ballard, 923 So. 2d at 482. "If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Reynolds v. State, 934 So. 2d 1128, 1145 (Fla. 2006) (citing Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002).

However, in this case, the State relied solely on circumstantial evidence to obtain its conviction, and "where a conviction is based wholly upon circumstantial

---

2. Because we conclude that there was insufficient evidence of sexual battery or robbery to support a felony murder theory, we do not address sufficiency of the evidence with respect to felony murder.

- 9 -

evidence, a special standard of review applies." Reynolds, 934 So. 2d at 1145 (quoting Darling v. State, 808 So. 2d 145, 155 (Fla. 2002)). "The special standard requires that the circumstances lead 'to a reasonable and moral certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a strong probability of, and be consistent with, guilt. They must be inconsistent with innocence.' " Lindsey v. State, 14 So. 3d 211, 215 (Fla. 2009) (quoting Frank v. State, 163 So. 223 (Fla. 1935)). "Although the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent substantial evidence." Ballard, 923 So. 2d at 482 (quoting Crain v. State, 894 So. 2d 59, 71 (Fla. 2004)). "[T]he evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached." De Groot v. Sheffield, 95 So. 2d 912, 916 (Fla. 1957). In this direct appeal, Dausch argues that the State produced insufficient evidence that he was the person who murdered Mobley. Based on our review of the record, we agree and conclude that the State did not introduce competent substantial evidence of the perpetrator's identity.

Without question, there is competent substantial evidence to place Dausch inside of Mobley's vehicle. Dausch does not dispute this fact. His presence in Mobley's car, then, would tend to create a suspicion of Dausch's guilt. However, suspicion alone is not enough. As we have stated:

> Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, [] is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.

Ballard, 923 So. 2d at 482 (quoting Davis v. State, 90 So. 2d 629, 631-32 (Fla. 1956)). The circumstantial evidence in this case leaves uncertain Dausch's hypothesis of innocence and is, therefore, "not adequate to sustain a verdict of guilt." Id.

The competent substantial evidence in this case links Dausch to Mobley's car—not to Mobley's murder. The State was unable to produce any witnesses to the murder. In fact, the State did not produce competent substantial evidence that even placed Dausch in Sumter County at or around the time of the murder. Moreover, the State's theory that Dausch murdered Mobley, stole his car, and abandoned it in Tennessee is countered by the State's fingerprint evidence. The fingerprints that were found on the car itself that belonged to Dausch were on the exterior of the rear driver's side. Dausch's fingerprints were not found anywhere in the immediate area where the driver sits. Dausch's fingerprint on a cigarette lighter wrapper merely places Dausch inside of the car, a fact that he does not

contest. Additionally, while Mobley's stolen wallet was found near the Florida/Georgia border along Interstate 75, and it contained latent fingerprints of value, the fingerprints did not belong to Dausch. This evidence is not inconsistent with Dausch's hypothesis of innocence that he hitchhiked a ride with someone who was already in possession of Mobley's car.

Moreover, while the State's DNA evidence may leave one suspicious of Dausch's guilt, that evidence does not constitute competent substantial evidence of identity. We are mindful that aspects of the State's DNA evidence included Dausch as a possible contributor, but other aspects excluded him. Dr. Ragsdale testified that Dausch was excluded as a source of the semen stains found on the sheet that was used to bind Mobley's hands and feet. Dr. Ragsdale also testified that Dausch was excluded as a contributor to the DNA recovered from Mobley's fingernails. Further, with respect to the anal swabs, Dr. Ragsdale testified that the frequency with which the re-extracted foreign DNA profile could be found in the population is as follows: 1 in 290 Caucasians, 1 in 790 African Americans, and 1 in approximately 500 Southeastern Hispanics. These frequencies, which were even more favorable to the State than the frequencies based on the initial analysis of the Fairfax data, were accompanied by a tenfold statistical deviation. Dr. Ragsdale conceded that the impact of the tenfold deviation meant that the frequency with which the DNA profile linked to Dausch could be found in the

human population ranged from 1 in 2900 Caucasians to 1 in 29 Caucasians. To that end, even the State candidly admitted in its brief that the DNA evidence relating to the anal swabs was "not as conclusive as some DNA matches." The State suggests that its DNA evidence was not as strong as it could have been because of the passage of time, but this suggestion is unavailing as we consider the sufficiency of the evidence. Such conjecture forces this Court to speculate as to what the evidence might have been. This we cannot do. Viewed in its entirety, the record lacks competent substantial evidence to support the jury's verdict.

## CONCLUSION

We do not take lightly the result that will flow from our decision today. We have reviewed the entire record in this case with the utmost seriousness and care. Yet, our comprehensive review of this case leaves us with the inescapable conclusion that the evidence is simply insufficient to conclude, beyond a reasonable doubt, that Dausch was the person responsible for murdering Mobley. At best, the evidence presented by the State creates a suspicion of guilt. Therefore, because we conclude that there is a lack of competent substantial evidence to support Dausch's convictions, we reverse and vacate both of Dausch's convictions and sentences. We remand this case to the trial court with instructions that a judgment of acquittal be entered.

It is so ordered.

PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, C.J., dissenting.

Though I would find that Dausch is entitled to a new trial because the trial court reversibly erred by excluding certain evidence, I cannot agree with the majority's decision to vacate his convictions on the ground that the evidence is insufficient to establish his identity as the perpetrator. In support of its decision, the majority holds—without citing any support—that admissible DNA evidence is not competent substantial evidence of identity. Majority op. at 12. Before today, we have never limited the jury's ability to decide the weight to give to admissible DNA evidence or set a threshold for how conclusive DNA evidence must be to constitute competent substantial evidence. Moreover, the majority fails to explain why the jury cannot rely on the nonexclusion DNA evidence presented in this case as proof of Dausch's identity as the perpetrator, together with the other competent evidence that corroborates that conclusion. Therefore, I respectfully dissent.

I admit that this is a more difficult case than some, in large part because the State's case against Dausch is wholly circumstantial. Such a case places a more exacting burden on the State in terms of what it must show to survive a defendant's

- 14 -

motion for judgment of acquittal. Specifically, the State must "introduce competent evidence which is inconsistent with the defendant's theory of events":

> [A] motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the [S]tate fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt. However, [t]he [S]tate is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence fails to exclude all reasonable hypotheses of innocence . . . , and where there is substantial, competent evidence to support the jury verdict, [the Court] will not reverse.

Serrano v. State, 64 So. 3d 93, 104 (Fla. 2011) (alternations in original) (internal quotations and citations omitted). In conducting our sufficiency review, we must view the evidence in the light most favorable to the State. See Kocaker v. State, 119 So. 3d 1214, 1225 (Fla. 2013) (explaining that the standard of review applicable to a motion for judgment of acquittal in a wholly circumstantial case requires the court to "determine whether there is a prima facie inconsistency between the evidence, viewed in [the] light most favorable to the State, and the defense theory or theories" and, if so, "the question is one for the finder of fact to resolve and the motion for judgment of acquittal must be denied" (emphasis added) (quoting Durousseau v. State, 55 So. 3d 543, 556-57 (Fla. 2010))).

In this case, Dausch's hypothesis of innocence was that he was never with the victim and that his fingerprints were found on the victim's car and on an item

- 15 -

inside the victim's car because he hitchhiked a ride with the actual killer after the murder occurred. Certain evidence outlined in the majority's decision lent credence to this theory. However, Dausch's theory was inconsistent with (i) DNA evidence that included him as a possible contributor to semen found inside the victim's anus, and (ii) consciousness-of-guilt evidence that he attempted to commit suicide on the eve of his trial. When considered together with the other evidence viewed in the light most favorable to the State, this evidence "support[s] an inference of guilt to the exclusion of all other inferences" and is therefore sufficient to support his convictions. Serrano, 64 So. 3d at 105.

Specifically, by choosing to credit the DNA evidence, which our precedent clearly allows it to do, the jury could have reasonably inferred that Dausch was the last person with the victim and, therefore, the killer. The statistical probabilities associated with the DNA evidence in this case are admittedly not as conclusive as those we have seen in other cases. However, unlike the majority, I am not willing to say, as a matter of law, that it was improper for the jury to rely on the DNA evidence to place Dausch with the victim, especially in light of the fingerprints linking Dausch to the car where the victim was last seen alive, the suicide attempt demonstrating Dausch's consciousness of guilt, and the witness testimony that placed a lone male matching Dausch's general description—rather than a driver and a hitchhiking passenger—abandoning the victim's car. Viewed this way—in

- 16 -

the light most favorable to the State—the evidence is inconsistent with Dausch's hitchhiking theory and sufficient to support his convictions.

In my view, the majority's decision to take this case from the jury is the result of three critical errors. First, without explanation, the majority concludes that the nonexclusion DNA evidence linking Dausch to the victim is not competent substantial evidence.[3] Second, the majority ignores that Dausch's suicide attempt is consciousness-of-guilt evidence that is probative of his identity as the perpetrator. Last, the majority fails to consider all of the identity evidence in its sufficiency analysis in the light most favorable to the State.

We trust juries to decide hard cases every day, and before today the evidence in this case—when viewed as a whole and in the light most favorable to the State—would have been sufficient to get to the jury.

## I. The DNA Evidence

In Florida and across the country, "DNA evidence is an important scientific tool that can assist in the identification of perpetrators of criminal offenses[.]" Brim v. State, 695 So. 2d 268, 271 (Fla. 1997). In fact, Florida has been credited with issuing "[t]he first reported case in which DNA evidence was held

---

3. Although the majority takes issue with the conclusiveness of the DNA evidence, it does not attempt to explain how conclusive DNA evidence must be to constitute sufficient evidence of identity. Consequently, it is impossible to gauge the significance of the majority's decision—both to those who were convicted as a result of DNA evidence and to those who seek to be exonerated by it.

admissible."  Roberson v. State, 16 S.W.3d 156, 165 (Tex. Ct. App. 2000) (citing

Andrews v. State, 533 So. 2d 841 (Fla. 5th DCA 1988)).

Today's decision is a different kind of first.  It is the first decision that I have

been able to find which holds that admissible DNA evidence is not competent

substantial evidence upon which the jury may rely to conclude that the defendant is

the perpetrator.  Although cases involving DNA evidence generally have more

conclusive probabilities than those at issue here, nonexclusion DNA evidence

exhibiting random match probabilities comparable to those in this case has been

accepted as sufficient evidence of identity.[4]  For example, in Roberson, a Texas

state appellate court rejected the defendant's argument that "DNA evidence

standing alone does not show that he was the person who committed the

[aggravated sexual assault]."  16 S.W.3d at 159.  There, the defendant "could not

be excluded as a donor of the sperm found on the vaginal swab," and the

"likelihood that [the DNA came from the African-American defendant] as opposed

to another random person in the [African-American] population [was] 1 in 1800."

Id. at 162.  Importantly, unlike this case, in Roberson, the DNA evidence was the

sole evidence of the defendant's guilt.  See id. at 158-59.

_____

        4. A random match probability denotes the chance of selecting, at random, a
person in the relevant population unrelated to the defendant whose DNA would
also match the sample.  As explained in the majority's opinion, the probabilities at
issue here are 1 in 290 Caucasians, 1 in 790 African Americans, and 1 in
approximately 500 Southeastern Hispanics.  Majority op. at 12.

Similarly, though in the context of admissibility rather than sufficiency, both federal and state courts generally recognize that it is for the jury to decide how much weight to give nonexclusion DNA evidence, even where its statistical significance is relatively low. For example, the United States District Court for the District of Columbia has explained that nonexclusion DNA evidence "remains probative, and helps to corroborate other evidence and support the Government's case as to the identity of the relevant perpetrators." United States v. Morrow, 374 F. Supp. 2d 51, 65 (D.D.C. 2005). In Morrow, the random match probabilities of the challenged nonexclusion DNA evidence exhibited "a relatively low level of statistical significance, ranging from a 1:12 probability of selecting an unrelated individual in the relevant population to a 1:1 probability of selecting an unrelated individual." Id. at 62; see also United States v. Graves, 465 F. Supp. 2d 450, 458-59 (E.D. Pa. 2006) (holding admissible nonexclusion DNA matches with random match probabilities of 1:2900 and 1:3600, but holding inadmissible a nonexclusion match with a random match probability of only 1:2 after concluding the probative value of admitting this evidence would be "substantially outweighed by the danger of unfair prejudice and confusion of the issues" because "half of the relevant population cannot be excluded as a contributor to the DNA sample").

More recently, the United States District Court for the District of New Mexico explained that "[c]ourts are reluctant to set a threshold on the level of

- 19 -

statistical significance, and have admitted DNA evidence when its statistical significance was relatively low." United States v. McCluskey, 954 F. Supp. 2d 1224, 1273 (D.N.M. 2013). Finding decisions such as Morrow and Graves persuasive, the federal district court held admissible nonexclusion DNA matches with random match probabilities of 1:9268, 1:21, and 1:12. Id. at 1273, 1275.

State court decisions are in accord with federal decisions generally holding that the jury should decide the weight to give to nonexclusion DNA evidence. For example, in Commonwealth v. Mattei, 920 N.E.2d 845, 848 (Mass. 2010), the Supreme Judicial Court of Massachusetts held that the trial court erred in admitting "expert testimony that DNA tests could not exclude the defendant as a potential source of DNA found at the crime scene, absent testimony regarding statistical findings explaining the import of such a result." In so holding, the court reasoned that, "[w]ithout reliable accompanying evidence as to the likelihood that the test could not exclude other individuals in a given population, the jury ha[s] no way to evaluate the meaning of the result." Id. at 855-56 (emphasis added); cf. Brim, 695 So. 2d at 269 (explaining that "the DNA testing process consists of two distinct steps"—a first step based on molecular biology and chemistry that "simply indicate[s] that two DNA samples look the same" and "[a] second statistical step [that] is needed to give significance to a match").

Indeed, the Supreme Court of Indiana likens the jury's evaluation of DNA match probabilities to its evaluation of an eyewitness's testimony that she is less than one hundred percent sure that it was the defendant whom she saw commit the crime: "[The witness's] statement that she is 'ninety-eight percent' positive of the identification goes to the credibility of her testimony. Expert testimony of a 'high statistical probability' in matching DNA is much the same. That the DNA match may not be absolute goes to the weight and credibility of the evidence." Hampton v. State, 961 N.E.2d 480, 493 (Ind. 2012); see also State v. Lang, 954 N.E.2d 596, 616-17 (Ohio 2011) (recognizing that expert testimony that "1 of 3,461 people could possibly be included as a potential source of the DNA" and that "the statistic has to be more than 1 in 280 billion to say to a reasonable degree of scientific certainty [that] this person is a source" "weakened the certainty of the DNA evidence," but concluding that "the jury remained free to assign this evidence whatever weight it deemed proper in arriving at the verdict") (internal quotation marks omitted); Commonwealth v. O'Laughlin, 843 N.E.2d 617, 633 (Mass. 2006) (rejecting defendant's challenge to the admissibility of DNA evidence that "only demonstrated that the likelihood that any individual contributed to the mixture of DNA was one in two" and concluding that "[t]he probative value of the evidence is for the jury to decide"); Commonwealth v. Crews, 640 A.2d 395, 403 (Pa. 1994)

("[T]he relevant, though inconclusive, DNA evidence was admissible in this case; its weight and persuasiveness were properly matters for the jury to determine.").

And at least one Florida district court has recognized that the jury may properly rely on nonexclusion DNA evidence as proof of identity. See Mickens v. State, 121 So. 3d 563, 565-66 (Fla. 4th DCA 2013). Only last year, in the context of a robbery case, our Fourth District Court of Appeal held in Mickens that "[a]ny concerns about the probative value of the DNA evidence [go] to the weight of the evidence and not its admissibility." Id. at 566 (citing Walker v. State, 707 So. 2d 300, 313 (Fla. 1997)). Accordingly, the Fourth District rejected the defendant's argument that the trial court erred by admitting nonexclusion DNA evidence that showed "a one in 2600 chance [that] an unrelated African-American male was the source of the DNA on the ski mask [worn by one of the robbers] instead of [the defendant]" because this evidence "did not conclusively identify him as one of the participants in the robbery." Id. at 564, 565.

More importantly, the Fourth District's decision in Mickens is in line with— and indeed expressly relies on—this Court's precedent allowing the use of test results that are much less conclusive than the probabilities normally associated with a true DNA match to help establish the defendant's identity as the perpetrator. See id. at 565 (citing our decision in Walker, 707 So. 2d 300, for the proposition

that "the Florida Supreme Court has been more lenient in allowing the admission of scientific tests which do not conclusively identify a defendant").

For example, in Walker, this Court rejected the defendant's argument that the trial court erred by denying his motion to suppress expert testimony concerning DNA evidence that was recovered from a cigarette filter found in the victim's car because it "was not relevant to any fact at issue in the case" since the test results were "not probative, by themselves," of the defendant's or his brother's presence in the victim's car. 707 So. 2d at 313. The DNA expert testified that the DNA on the filter was "shared by [the defendant], his brother[,] and 12.2 percent of the African-American population, 6 percent of the Caucasian population, and 4.8 percent of the Hispanic population." Id. This Court held that the defendant's concerns went "to the weight of the DNA evidence—which [he] had an opportunity to argue was low—and not to its admissibility." Id.; see also Mann v. State, 420 So. 2d 578, 580 (Fla. 1982) (holding the trial court properly admitted blood type evidence even though the defendant's "bloodtype and type of enzymes [were] the same as those of the victim"); Williams v. State, 197 So. 562, 564-65 (Fla. 1940) (holding blood type evidence admissible because "[a]ny evidence tending to identify defendant as the guilty person, and show his presence at the scene of the crime, is relevant and competent"); cf. United States v. Cuff, 37 F. Supp. 2d 279, 281 (S.D.N.Y. 1999) (explaining that "the results of PCR [DNA]

testing are much like the results of blood type or hair sample type testing" because, like these tests, " 'PCR testing is generally not used as a method to establish a statistical 'match' between a sample and an individual, but, rather, is used as a technique to <u>exclude</u> certain individuals as possible contributors to a particular sample' " (quoting <u>United States v. Hicks</u>, 103 F.3d 837, 845 (9th Cir. 1996))).

Accordingly, before today, this Court has never limited the jury's ability to decide the weight to give to otherwise admissible DNA evidence or purported to set a threshold for how conclusive DNA evidence must be to constitute competent substantial evidence. Not only does the majority fail to acknowledge this, but it also fails to explain why the jury cannot rely on the nonexclusion DNA evidence presented in this case as proof of identity.

## II. The Suicide Attempt

The majority also fails to address that the jury could have properly relied on Dausch's suicide attempt in support of its conclusion that he murdered the victim. Like the DNA evidence, proof of Dausch's consciousness of guilt is competent evidence that is inconsistent with his hypothesis of innocence.

This Court has explained that "[e]vidence that a suspected person in any manner endeavors to evade a threatened prosecution by any <u>ex post facto</u> indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from

such actions." Penalver v. State, 926 So. 2d 1118, 1133-34 (Fla. 2006) (quoting Sireci v. State, 399 So. 2d 964, 968 (Fla. 1981)). For the first time, in Penalver, we applied this standard to an alleged suicide threat. Id. Based on the specific facts of Penalver's case—which included an ambiguous threat by a defendant who ultimately turned himself in—we held that the trial court erred in admitting the alleged suicide threat since it "was not an 'endeavor to evade threatened prosecution' because at the time [the defendant] made the threat, he was not under arrest and had not been threatened with prosecution." Id. at 1134.

However, as the Fourth District Court of Appeal recently explained, this Court's decision in Penalver set the "ground rules" for when a suicide threat or attempt is admissible to prove the defendant's consciousness of guilt. Sloan v. State, 104 So. 3d 1271, 1273-74 (Fla. 4th DCA 2013). In Sloan, the Fourth District held that the trial court did not abuse its discretion in admitting the defendant's suicide attempt as evidence of his consciousness of guilt because "there was a sufficient nexus between the defendant's suicide attempt and the crime to render it admissible." Id. at 1274. There, the defendant attempted suicide before "the issuance of the arrest warrant, [but] after [he] was aware that law enforcement had been notified of the [crime]." Id. at 1273.

Further, as we recognized in Penalver, other states "have allowed evidence of a suicide threat as proof of consciousness of guilt." 926 So. 2d at 1133 (citing

People v. O'Neil, 165 N.E.2d 319, 321 (Ill. 1960) (explaining that the threat of suicide is similar to flight because it tends to show consciousness of guilt); Commonwealth v. Sanchez, 610 A.2d 1020, 1028 (Pa. 1992) (recognizing that "manifestations of mental distress tend to demonstrate a defendant's consciousness of guilt"); State v. Seffens, No. 01–C01–9107CR00190, 1992 WL 75831, at *4 (Tenn. Crim. App. Mar. 16, 1992) (finding admissible evidence that the defendant threatened to kill himself and his wife because "[s]ome courts have held this evidence is analogous to evidence of flight to show a consciousness of guilt")); see also State v. Brown, 517 A.2d 831, 838 (N.H. 1986) ("Just as a jury may consider flight after a crime as showing consciousness of guilt, it may also consider attempted suicide, as an 'attempt to flee and escape forever from the temporal consequences of one's misdeed.' " (citation omitted; quoting 2 J. Wigmore, Evidence § 276, at 131 (Chadbourn rev. 1979))); Charles W. Ehrhardt, Florida Evidence § 403.1 (2013 ed.) ("Evidence of conduct or speech of the accused which demonstrates a consciousness of guilt is relevant since it supplies the basis for an inference that the accused is guilty of the offense.").

In this case, Dausch did not merely threaten to commit suicide. He attempted to do so on the eve of his original trial date. Under the standard set forth in Penalver, Dausch's suicide attempt is plainly evidence of his consciousness of guilt. The majority does not hold to the contrary, and indeed specifically

recognizes Dausch's suicide attempt and the State's reliance on it as proof of his consciousness of guilt in its recitation of the facts. However, in analyzing the sufficiency of the evidence, the majority omits any reference to Dausch's suicide attempt and fails to acknowledge that this consciousness-of-guilt evidence is inconsistent with his theory of innocence and one more link in the circumstantial chain establishing his identity as the perpetrator. Our precedent requires us to view all of the evidence—including consciousness-of-guilt evidence—in the light most favorable to the State. See Kocaker, 119 So. 3d at 1225. Viewed this way, Dausch's suicide attempt evinces his consciousness of guilt and is therefore probative of—even if insufficient alone to establish—his identity as the perpetrator.

### III.  Viewed as a Whole and in the Light Most Favorable to the State, the Evidence is Sufficient

Lastly, the majority's erroneous treatment of the DNA evidence and suicide attempt is compounded by its failure to collectively view this evidence with other competent evidence from which the jury may infer that Dausch is the perpetrator, and to do so in the light most favorable to the State. Specifically, the other evidence implicating Dausch consists of his fingerprints on the victim's car and on an item in the victim's car, as well as a witness's testimony that he saw a lone Caucasian male matching Dausch's general description abandoning the victim's car.

The majority is correct that the evidence against Dausch is circumstantial because it does not prove—without inference—that he was the person who murdered the victim. See Thorp v. State, 777 So. 2d 385, 390 (Fla. 2000) ("DNA evidence, like fingerprint evidence, does not conclusively prove that [the defendant] committed the murder[.]"); see also Hampton, 961 N.E.2d at 493-94 ("The DNA evidence in this case was direct evidence only of the defendant's presence with the victim at some prior time, but only circumstantial as to the defendant's criminal conduct[.]"). However, the majority is wrong to view the evidence in the light most favorable to Dausch instead of viewing the evidence as a whole in the light most favorable to the State.

As illustrated in Washington v. State, 653 So. 2d 362, 365-66 (Fla. 1994), all of the evidence must be considered in determining whether "to allow the issue of [the defendant's] guilt to be submitted to a jury." Accordingly, in holding that the State met its burden in Washington's case, we considered "DNA test results that matched [Washington's] semen with those found at the murder scene; microscopic tests that matched his hair characteristics with hairs found at the murder scene; his possessing and selling the victim's watch; and his proximity to the victim's home." Id. at 366. And we held that, "[b]ased on this evidence, the jury had sufficient basis to exclude all reasonable hypotheses of Washington's innocence." Id.

- 28 -

Just as the identity evidence in <u>Washington</u> was not limited to DNA evidence, this is simply not a case where the <u>only</u> proof of Dausch's identity as the perpetrator is a 1 in 290 probability that someone else in the Caucasian population was the source of the semen recovered from the victim's anus. Instead, the DNA evidence in this case helps to corroborate other competent evidence that, when considered together, proves Dausch's identity as the perpetrator—i.e., the fingerprints, the witness testimony of a lone man matching the defendant's general description abandoning the victim's car, and the suicide attempt. <u>Cf.</u> <u>Hicks</u>, 103 F.3d at 846 (recognizing that even though a PCR DNA test "did not result in a statistical probability that [the defendant] contributed to the sample [and] <u>only</u> concluded that [the defendant] could not be excluded as a contributor to the sample" and therefore "was almost certainly not sufficient evidence to identify [the defendant] as one of the carjackers, [it] helped to corroborate other evidence of identity to build a wall of evidence supporting that conclusion"), <u>overruled on other grounds by</u> <u>United States v. W.R. Grace</u>, 526 F.3d 499, 509 (9th Cir. 2008).

To decide whether sufficient evidence supports the jury's verdict, we do not just view the evidence collectively; we also must view it in the light most favorable to the State. <u>McDuffie v. State</u>, 970 So. 2d 312, 332 (Fla. 2007) ("We conclude that <u>the totality of the evidence</u> . . . was sufficient to overcome the motion for judgment of acquittal made at the conclusion of all the evidence and to support the

verdicts of the jury.") (emphasis added); <u>Kocaker</u>, 119 So. 3d at 1225 (explaining that the evidence must be viewed in the light most favorable to the State); <u>see also</u> <u>Whitfield v. State</u>, 56 S.W.3d 357, 360 (Ark. 2001) ("[T]he DNA evidence when considered with the additional circumstantial evidence adduced at trial was sufficient evidence to support [the defendant's] convictions."); <u>Gallien v. State</u>, Nos. 01-09-00968-CR, 01-09-00969-CR, 2011 WL 1530859, at *3 (Tex. Ct. App. Feb. 24, 2011) (holding that the defendant's fingerprints on an item in the victim's car and expert testimony that he "could not be excluded as a contributor to the DNA mixture found on the steering wheel of [the victim's] car and that the chance that an unrelated person selected at random could be such a contributor would be 1 in 1000" was sufficient evidence of the defendant's identity as the perpetrator).

Contrary to our precedent, the majority improperly views the evidence through the lens of the defendant's hitchhiking theory. However, because the State met its burden to introduce competent evidence inconsistent with that theory (i.e., the DNA and suicide attempt), the majority's focus should not be on whether it would have accepted the defendant's theory but, instead, on whether the evidence is sufficient to support an inference of guilt to the exclusion of the defendant's hypothesis of innocence. <u>See</u> <u>Kocaker</u>, 119 So. 3d at 1225 (explaining that inconsistencies in the evidence are for the jury).

Accordingly, in analyzing whether competent substantial evidence supports the verdict in this case, the fingerprints may be viewed as evidence that connects the defendant to the victim's car, where the victim was last seen alive. Similarly—though the majority entirely omits this evidence from its analysis—the witness's testimony that a lone male generally matching Dausch's description abandoned the car supports the reasonable inference that Dausch abandoned the victim's car as a driver rather than a hitchhiker. Regardless of whether any of this evidence would be sufficient—i.e., competent and substantial—when considered individually, when viewed together in the light most favorable to the State, the DNA, plus the suicide attempt, plus the fingerprints, plus the witness testimony, support a reasonable inference that Dausch is a murderer rather than a hitchhiker. Therefore, the evidence is sufficient to support his convictions. See Serrano, 64 So. 3d at 105 (holding the evidence sufficient where it "support[ed] an inference of guilt to the exclusion of all other inferences").

## IV. Conclusion

Contrary to the majority's holding, after being informed about the statistical significance of admissible DNA evidence, it should be for the jury to decide how much weight to give the evidence. The majority strips the jury of this critical function and improperly ignores consciousness-of-guilt evidence that contributes to the defendant's identity as the perpetrator. Viewed together and in the light

- 31 -

most favorable to the State, the DNA evidence, suicide attempt, fingerprints, and witness testimony are sufficient to support Dausch's convictions for aggravated battery and premeditated first-degree murder. Accordingly, he is not entitled to a judgment of acquittal.

Nevertheless, there were reversible errors in this case. Specifically, I would find dispositive the trial court's refusal to allow Dausch to offer what he claims is a suicide letter—under the state-of-mind exception to the hearsay rule—to rebut the State's argument that Dausch's suicide attempt demonstrated his consciousness of guilt. See § 90.803(3), Fla. Stat. (2011). Because consciousness of guilt was a significant piece of the State's circumstantial case against the defendant, I am not convinced that this error was harmless beyond a reasonable doubt. However, instead of setting the defendant free, I would remand for a new trial.

I respectfully dissent.

An Appeal from the Circuit Court in and for Sumter County,
    William Henry Hallman, III, Judge - Case No. 2006-CF-301

James S. Purdy, Public Defender, Daytona Beach, Florida; and Christopher Sinclair Quarles and Nancy Jean Ryan, Assistant Public Defenders, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Mitchell D. Bishop, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee